[No. S004756. Aug. 12, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD GALVAN MONTIEL, Defendant and Appellant.

**COUNSEL**

Gary M. Sirbu, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and William G. Prahl, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—In 1979, a jury convicted defendant Richard Galvan Montiel of the first degree murder (Pen. Code, §§ 187, 189)[1] and robbery (§ 211) of Gregorio Ante, the robbery of Eva Mankin, and the burglary (§ 459) of Ms. Mankin's residence. Both the Mankin and Ante episodes occurred on January 13, 1979. With respect to the Ante crimes, the jury found true allegations that defendant personally used a deadly weapon, a knife, in the murder (§ 12022, subd. (b)) and that the robbery was committed against an aged person (§ 1203.09, subds. (a), (b)(i), (iii)), with great bodily injury (§ 12022.7), and by personal use of a deadly weapon. Under the 1978 death penalty law, the jury also sustained special circumstance allegations that the murder was committed in the course of a robbery (§ 190.2, subd. (a)(17)(i)) and intentionally for financial gain (*id.*, subd. (a)(1)).

When the jury was unable to reach a penalty verdict, a penalty mistrial was declared, a new jury was empanelled, and the issue of penalty was retried. The second jury sentenced defendant to death.

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

We affirmed the guilt judgment, the various enhancements, and the robbery-murder special-circumstance finding. However, we set aside the financial-gain special circumstance and, for unrelated reasons, we reversed the penalty judgment. (*People* v. *Montiel* (1985) 39 Cal.3d 910 [218 Cal.Rptr. 572, 705 P.2d 1248] (*Montiel I* ).)

A third penalty trial took place in 1986, and defendant again received a death sentence. His automatic motion for modification of the verdict (§ 190.4, subd. (e) (hereafter § 190.4(e)) was denied. This appeal is automatic.

Though errors occurred below, they were individually and cumulatively harmless by any applicable standard. (See *Chapman* v. *California* (1967) 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Brown* (1988) 46 Cal.3d 432, 446-449 [250 Cal.Rptr. 604, 758 P.2d 1135]; see also *Strickland* v. *Washington* (1984) 466 U.S. 668, 694-695 [80 L.Ed.2d 674, 697-699, 104 S.Ct. 2052].) We will therefore affirm the death judgment.

FACTS

1. *Crimes of January 13, 1979.*

 a. *Robbery of Eva Mankin.*

The prosecution presented the following undisputed evidence:[2] On January 13, 1979, defendant was living at his parents' home in Bakersfield. A neighbor, 74-year-old Eva Mankin, returned to her residence that morning with several bags of groceries. She placed her purse and keys on her front porch and began transferring the grocery bags from her car to the porch. As she did so, defendant approached with two small children and announced his intent to put away her groceries for her. Ms. Mankin declined help, but defendant insisted. She knew "something was wrong," because his eyes were "stary and glary." She unlocked the door and allowed defendant and the two children each to carry a bag into the house. The children emerged but defendant remained inside. Feigning calm, Ms. Mankin thanked him and gently told him he had to leave. She touched his shirt, led him out of the house, then closed and locked the door behind him.

Defendant began banging on the door. Ms. Mankin telephoned the emergency operator and called to defendant that she was summoning the police.

---

[2]Ms. Mankin was deceased at the time of the second penalty retrial in 1986. Her testimony from the 1979 trial was read to the jury. (Evid. Code, §§ 240, 1291.)

Nonetheless, he smashed the glass in the front door, reached in, unlocked the door from the inside, and entered the house. Ms. Mankin continued to protest that she had called the police, but defendant demanded her purse "two or three times," then grabbed it and fled. She later recovered the purse from her front yard, but a checkbook, several bank books, her husband's knife, and some cash were missing. She identified several of these items at trial.

b. *Murder of Gregorio Ante.*

The People introduced evidence that Gregorio Ante, a 78-year-old Bakersfield resident, was killed in his South King Street home around midday on January 13, 1979. The cause of death was a deep slash wound to the throat, which severed Gregorio's carotid arteries and blocked his breathing passage.

Moments before his death, Gregorio had received $200 in cash from his grandson Dennis Hall for the sale of a piano. Gregorio placed this money in the pocket of his T-shirt, over which he was wearing a Pendleton shirt. Gregorio then gave his son, Henry, $20 from that pocket to buy parts for a faucet repair. As Henry left to purchase the parts, he saw two men with a motorcycle in front of the house.[3]

Soon thereafter, David Ante, another of Gregorio's grandsons, telephoned Gregorio and received no response. David immediately went to Gregorio's residence and found his grandfather's body. There was $180 in cash in Gregorio's T-shirt pocket, but money was missing from his pants pockets, the living room and master bedroom had been ransacked, and a container of coins was missing from the house.

Further evidence about this incident was presented by defense witness Victor Cordova. Victor, a seller and user of phencyclidene (PCP), testified as follows: Defendant arrived at the Cordova home during the morning of January 13. Also present were Victor's wife Maury, and Maury's mother and sister, Kathy and Lisa Davis. Defendant's hands and arms were scratched and cut, and his shirt was bloody. His appearance, behavior, and incoherent speech indicated he was "loaded" on PCP. Victor cut a piece of dangling flesh from a deep wound on defendant's left arm. Defendant registered no pain. Victor dressed the wound and gave defendant a fresh shirt. Defendant smoked part of a PCP cigarette furnished by Victor and continued his bizarre behavior and speech. He made advances to Kathy Davis, kept trying to wipe a mole from Lisa Davis's face, and challenged Victor to "deck [him] . . . out."

---

[3]Henry was deceased at the time of the 1986 penalty retrial, and his testimony from the 1979 trial was read to the jury.

Unwilling to cope with defendant in his intoxicated state, Victor decided to transport defendant to the home of defendant's brother. The two men proceeded in that direction on Victor's motorcycle. Near the intersection of Brundage and South King Streets, the motorcycle's chain came off the sprocket. Victor pushed the disabled cycle to a nearby garage and telephoned his wife Maury for rescue. Meantime, defendant, who was carrying a can of beer in a sack, walked off briskly toward a nearby home on South King Street.

Two or three minutes later, defendant returned and announced he had just "killed a guy." Defendant seemed "concerned" about a beer can he had left in the victim's house, and he demanded that Victor retrieve the can for him. When Victor refused, defendant reentered the house himself and soon returned holding the can. Using throat-slitting gestures to demonstrate his point, he then told Victor he had killed a man "like you would do a goat."

Maury soon arrived in the Cordovas' pickup truck. With her were Tommy Stinnett and "Marlene," defendant's girlfriend. As the motorcycle was placed in the truck, defendant boasted to the others about the homicide; his tone was loud and "mean." The boasting resumed after the group arrived back at the Cordova home. Victor and Maury took defendant into the bedroom and asked him what had happened. In response, defendant removed a sack from his pocket. The sack contained coins, some cash, and a bloody knife. Frightened, Victor took the knife and threw it into a nearby canal.

Defendant continued to say and do things that made no sense. He squatted in a corner, staring blankly. When Maury used the phrase "Jesus Christ," he told her sharply not to mention that name around him because he was the devil. Victor drove defendant and Marlene to a motel, registered in his own name, and left the couple in a room.

Later that evening, Victor encountered defendant, still "loaded," at the home of a mutual acquaintance. Victor asked defendant if he realized what he had done and advised defendant to flee to Mexico. Defendant gave Victor a penetrating look and nodded.

On cross-examination, Victor admitted that several weeks before the 1986 retrial, he had encountered defendant in the Kern County jail. Defendant asked Victor to lie about the amount of PCP he had consumed on the day of the murder.

2. *Mental state/intoxication evidence.*

Both parties introduced extensive evidence about defendant's mental state and degree of intoxication during the Mankin and Ante crimes. As in 1979,

the People presented Dr. Ronald Siegel, a psychopharmacologist with particular expertise in the effects of PCP. In preparation for his 1979 testimony, Dr. Siegel had interviewed defendant and obtained defendant's detailed accounts of his long-term drug history, his alcohol and drug consumption immediately before the crimes, and the crimes themselves. Dr. Siegel had also interviewed Victor and Maury Cordova, Lisa Davis, and Tommy Stinnett; further, he had reviewed certain 1979 trial testimony and examined police reports.

Based on this previously obtained information, Dr. Siegel conceded in 1986 that defendant was "grossly intoxicated" by PCP and alcohol on January 13, 1979, and that defendant's motor functions and judgment were somewhat impaired as a result. Dr. Siegel acknowledged that PCP had unpredictable effects, and that it can reduce impulse control, cause distorted perception, produce episodic partial amnesia, and exaggerate aggressive or violent tendencies. He further recognized that extended use of PCP can lead to a chronic mental disorder which includes momentary delusional episodes. Nonetheless, Dr. Siegel opined that on the day and at the time of the murder, defendant was not hallucinating, was "capable of some goal direction activity," and "knew what he was doing." Among other things, Dr. Siegel stressed defendant's successful efforts to find and take money from Gregorio's house, his immediate concerns about covering up his crime, and his relatively clear memory of the events.

Defendant presented further evidence about his drug history, and about his alcohol and PCP consumption immediately preceding the January 1979 crimes. His parents recounted a pattern of substance abuse beginning with teenage glue sniffing and progressing to regular alcohol and PCP use during adulthood. His sister Irene testified that he had ingested large quantities of PCP on or about January 13, 1979. Other family members disclosed that he had been hallucinating and talking incoherently for several weeks before that date.

Defendant also introduced the expert testimony of Dr. Louis Nuernberger, a psychiatrist formerly employed by the Department of Corrections. Between 1977 and 1981, Dr. Nuernberger had responsibility for inmate mental health concerns at San Quentin. He was assigned to evaluate defendant's mental condition when defendant arrived on death row in 1979. In cooperation with a psychologist, Dr. Nuernberger interviewed defendant and reviewed his prison "central file" and psychological tests. Dr. Nuernberger had no specific background in psychopharmacology, but his prison duties made him familiar with the drug and criminal histories of defendant and numerous other inmates.

Dr. Nuernberger opined that chronic drug abuse is both a cause and a result of deep lifelong alienation and depression. He conceded that defendant is legally "sane" and has no gross mental disorder apart from drug-induced "toxic dementia." However, Dr. Nuernberger concluded that defendant's "extended intoxication with PCP and alcohol" eroded his self-control and judgment, fragmented his personality and consciousness, and exaggerated his violent tendencies, so as to be "directly responsible for the homicide." Dr. Nuernberger emphasized defendant's cooperative and nonviolent behavior in the drug-free prison setting.

### 3. *Other crimes.*

The prosecution presented evidence of five other violent episodes, one of which resulted in a felony conviction. Called as prosecution witnesses, defendant's mother Hortencia, his father Richard, Sr., and his brother Antonio confirmed a 1968 scuffle between defendant and Antonio, in which Antonio received a three- to four-inch cut on his chest. However, Richard, Sr., and Hortencia claimed they had little recollection of the incident. They denied seeing defendant with a knife and denied telling responding deputies he had stabbed Antonio. Both denied any memory of violence by defendant toward Richard, Sr. Hortencia denied telling deputies the scuffle began when defendant tried to hit her with a telephone. Antonio denied knowing or believing that defendant had stabbed him.

Deputy Sheriffs Leavell and Fowler then testified that they responded to the 1968 scuffle. At the scene, Hortencia and Richard, Sr., told the following story: During an argument at the home of defendant's parents, defendant tried to hit Hortencia with a telephone. Antonio intervened, and the two brothers went outside to fight. Defendant carried a butcher knife with him. Shortly thereafter, Hortencia tried to separate the combatants and felt blood on Antonio's shirt. Richard, Sr., stated defendant had cut Antonio and also said he himself had been beaten by defendant in the past. After the fight with Antonio ended, defendant's parents reported, defendant had left the scene in a yellow or cream-colored 1957 Chevrolet. According to the deputies, they subsequently seized a butcher knife from a car matching that description which was parked near defendant's residence.

Rachel Montiel, defendant's separated wife, confirmed a 1969 argument involving defendant, Rachel, and Rachel's sister Yolanda Estrada. However, Rachel denied seeing defendant deliver a blow to the abdomen of Yolanda, who was then six months pregnant. Rachel insisted Yolanda attacked defendant and, though her testimony on the point is not entirely clear, appeared to

state that defendant never struck back.[4] Retired Deputy Sheriff Shell then testified that when he responded to the 1969 argument, Rachel told him defendant had struck both women and had hit Yolanda in the stomach.

Deputy Leavell testified about a 1971 incident which occurred while he and Deputy Williams were on duty at the Kern County Fair. According to Leavell, he and Williams assumed custody of defendant after defendant's arrest by other officers who had seen him wrestle a stuffed bear from an elderly woman. Defendant broke loose and ran; Leavell gave chase, tackled defendant, and handcuffed him after a "short fight." Struggling all the way to the sheriff's trailer, defendant threatened to kill the deputies' wives and children and burn their homes.

Two employees of a Foster Freeze restaurant testified that in 1972 defendant entered, brandished a small handgun, demanded money, and was given $30. One employee, Denise Brown, thought the gun "looked real," but the other, Ronald Jones, said it looked like a starter pistol. When Jones chased defendant down an alley, defendant turned and fired twice. Jones ducked and was not hit. He heard no bullets. The abstract of judgment indicated that defendant pled guilty to second degree robbery for this incident, without enhancements for firearm or weapon use.

Anthony Ramirez testified that he returned home one evening in 1973 to find defendant removing a television set from Ramirez's apartment. Ramirez chased defendant, who turned and displayed a knife. The prosecution introduced evidence that defendant pled guilty to a misdemeanor charge of burglary.

### 4. *Other mitigating and rebuttal evidence.*

Various members of defendant's family testified that the Montiels' family life was happy, and that defendant was well behaved and a good student until he chose the wrong friends and became involved with drugs and alcohol in high school. These witnesses indicated that defendant was always respectful and nonviolent toward his parents, that family members visited and wrote him in jail and prison, and that they loved him. Richard, Sr., and Hortencia specifically denied that defendant had been violent toward them.

---

[4] The following exchange occurred: "Q[.] [By the prosecutor] And during this argument, did the defendant strike [Yolanda] in the stomach? [¶] A[.] No. My sister struck him first. [¶] Q[.] After you say she struck him, then did the defendant strike her in the stomach? [¶] A[.] No, uh-uh. She was just defending me. [¶] . . . [¶] Q[.] Are you saying that the defendant here never struck her at all on that day? [¶] A[.] No." Rachel's trial claim that Yolanda was the physical aggressor, and that defendant did not retaliate, was essentially corroborated by Yolanda's mother, Helen Pacheco, who testified for the defense.

Rachel admitted that defendant had a drinking problem during their marriage, and that defendant sometimes became violent when drunk.

Defendant presented evidence of his rehabilitation on death row. Harry Howard, a prison chaplain, testified that defendant regularly attended voluntary religious services. Salvatore Russo, a prison teacher, said defendant tried to improve his reading, writing, and mathematics skills and made progress in these areas. Norman Davis, a guard supervisor, testified that defendant presented no behavioral problems in San Quentin. Emanuel Edward, a jail guard, gave similar evidence about defendant's conduct in the Kern County jail.

Defendant testified in his own behalf. He described the confined life of a condemned inmate but indicated his good behavior had qualified him for maximum death row privileges. He confirmed the religious, educational, and artistic interests he had developed in prison, and a painting he had done was admitted into evidence. Defendant indicated that, over time, he had developed empathy and remorse about Gregorio's murder, saying he knew "what it is to lose a loved one." Defendant indicated he would give his life to bring the victim back to life if that were possible. However, he admitted on cross-examination that his Christian principles did not include full literal agreement with the maxim "an eye for an eye."

PRETRIAL AND JURY SELECTION ISSUES

1. *Court's ex parte meeting with cocounsel Fuller.*

On the morning of October 21, 1986, just before the second day of jury selection began, a chambers conference took place on the record, in defendant's presence, among appointed lead defense counsel Robert Birchfield, appointed cocounsel Peggy Fuller, the prosecutor, and the court. Birchfield said he and Fuller had decided, with defendant's concurrence, that for reasons of efficiency Birchfield should be "primarily involved in the courtroom presentation" while Fuller undertook research and coordination duties outside the courtroom. Fuller confirmed these points. The court commented that the proposed division of labor "made sense" and suggested that Birchfield ask prospective jurors whether they would be influenced by Fuller's periodic absences from court.

Earlier the same morning, Fuller had met ex parte with Judge Ferguson, who was presiding at defendant's trial. In April 1990, an evidentiary hearing was held before Judge King to settle what occurred during this unreported meeting.

The resulting settled statement declares in substance as follows: About 8:30 a.m. on October 21, 1986, Fuller asked to see Judge Ferguson on a "personal matter." In a "very brief" meeting, Fuller told him she was "concerned about the general manner in which [Birchfield] was handling the case and . . . did not know what to do." "As a solution," she and Judge Ferguson "discussed the possibility that in the future, [she] could do legal research for the defense outside of the courtroom rather than participating personally in the courtroom proceedings." She had previously discussed with Birchfield this change in her role.

 Defendant argues from these facts that he was denied his state and federal constitutional right to effective, conflict-free representation. He reasons as follows: By disclosing uncertainty how to handle her reservations about Birchfield's performance, Fuller revealed a "conflict" between her representational duties, on the one hand, and her concerns for her own professional reputation and her desire not to embarrass Birchfield, on the other. The court violated its duty to pursue and resolve a potential conflict brought to its attention, and defendant was given no opportunity to waive the conflict with full knowledge. (See *People* v. *Bonin* (1989) 47 Cal.3d 808, 836-837 [254 Cal.Rptr. 298, 765 P.2d 460].) Hence, reversal is required, because the record shows (see *Wood* v. *Georgia* (1981) 450 U.S. 261, 272-274 [67 L.Ed.2d 220, 230-232, 101 S.Ct. 1097]; *Bonin, supra,* 47 Cal.3d at pp. 837-838), or at least permits informed speculation (see *Holloway* v. *Arkansas* (1978) 435 U.S. 475, 484-491 [55 L.Ed.2d 426, 434-439, 98 S.Ct. 1173]; *People* v. *Mroczko* (1983) 35 Cal.3d 86, 105 [197 Cal.Rptr. 52, 672 P.2d 835]), that the conflict prevented Fuller from seeking Birchfield's removal, withdrawing, or participating fully at trial, and thus adversely affected her performance.

However, the record does not support defendant's elaborate claims of a constitutional "conflict." At most, the evidence indicates that at a particular moment, Fuller had unspecified disagreements with lead counsel's conduct of the case, briefly sought Judge Ferguson's advice about how to proceed, and ultimately confined herself to noncourtroom activities.

There is no indication that Fuller was motivated by anything except her sense of professional obligation. (Compare *Bonin, supra,* 47 Cal.3d 808 ["book rights" fee arrangement; counsel's prior relationship with accomplice]; *People* v. *Singer* (1990) 226 Cal.App.3d 23 [275 Cal.Rptr. 911] [counsel secretly dated defendant's wife]; *People* v. *Jackson* (1985) 167 Cal.App.3d 829 [213 Cal.Rptr. 521] [counsel secretly dated prosecutor].) Good faith tactical differences among cocounsel are not uncommon, and they do not create a "conflict of interest" in the constitutional sense. The state and federal Constitutions do not demand complete compatibility among appointed cocounsel (cf. *Morris* v. *Slappy* (1981) 461 U.S. 1, 14 [75 L.Ed.2d

610, 621-622, 103 S.Ct. 1610] [Sixth Amendment does not guarantee "meaningful relationship" between accused and appointed counsel]), require judicial inquiry into any and all signs of disagreement, or mandate particular working relationships within the defense team.

The instant record discloses no "fundamental" breakdown among defendant, Birchfield, and Fuller (cf., e.g., *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1163-1164 [259 Cal.Rptr. 701, 774 P.2d 730] [dispute between defendant and counsel not so "fundamental" as to "substantially impair" right to effective counsel]), nor does it indicate that the logical division of attorney responsibility endorsed by the trial court had the slightest adverse effect on the defense. ▬ █ No basis appears for a finding of reversible conflict.[5]

█ For similar reasons, we also reject defendant's suggestion that Judge Ferguson erred by failing to inquire sua sponte into the possibility that Birchfield should be replaced for incompetence. Of course, the court must allow the *accused* to give *specific reasons* why he wishes replacement of his appointed counsel (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]), but no request for substitution and no specification of reasons was then forthcoming from either defendant or Fuller. Fuller's brief, general, and very tardy complaint that she was "concerned" about the "general manner" in which Birchfield was "handling the case" but "did not know what to do" was not sufficient to trigger further judicial inquiry.[6]

---

[5]Defendant suggests he had a constitutional "right" to the full courtroom presence of both cocounsel. Hence, he reasons, Fuller's sudden decision to absent herself from trial was an "abandonment" of her representational duties. According to defendant, his silent acquiescence when advised of Fuller's limited future role was not a knowing and voluntary waiver of his rights, since he was not told on the record the true reason for the new arrangement. As defendant concedes, however, there is no authority for the proposition that a capital defendant has the right to the courtroom presence of both appointed cocounsel. We decline to announce such a rule here. Nor does the record give any indication that Fuller abandoned defendant. Indeed, she filed an evidentiary motion *in limine* two days after the chambers conferences at issue here.

Finally, defendant asserts that even if no actual effect on the defense can be discerned, Fuller's actions and concerns create an "appearance of impropriety" which warrants reversal. We are not persuaded.

[6]Defendant claims the settled statement of the unreported conversation between Fuller and Judge Ferguson is inaccurate in material respects. According to "undisputed" evidence adduced at the April 1990 settlement hearing, he contends, Fuller revealed a clear conflict to Judge Ferguson and gave sufficient information to trigger an inquiry about Birchfield's competence. In 1991, we denied defendant's motion to "correct" the settled statement.

Nonetheless, defendant seeks to buttress his current claims with testimony given by Fuller at the settlement hearing. There Fuller said, among other things, that she reminded Judge Ferguson of a *Marsden* motion defendant had filed against Birchfield, but had then withdrawn, in August 1986. According to Fuller, she indicated to Judge Ferguson, but without

## 2. *Wheeler motion.*

 Defendant argues that the trial court erred by rejecting his claim that the prosecutor improperly used a peremptory challenge to excuse prospective juror Sonia Gomez for the sole reason that she was Hispanic. (E.g., *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]; see *Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]; see also *Powers* v. *Ohio* (1991) 499 U.S. 400 [113 L.Ed.2d 411, 111 S.Ct. 1364].) We disagree.

Defense counsel made no objection when the prosecutor used his fourth peremptory challenge to excuse prospective juror Elizabeth Gutierrez. However, when the prosecutor used his ninth peremptory challenge to excuse Gomez, defense counsel raised an immediate protest, noting that both Gomez and Gutierrez "appear[ed] to be of Mexican-American descent."

The court responded that it could "see a reason for [challenging] Gutierrez" but that the basis for excusing Gomez was "much less clear." The court then asked the prosecutor whether he "want[ed] to state some reason for your peremptory."

A rambling discussion ensued among court and counsel. The prosecutor indicated his excusal of Gomez stemmed from her statements that she had no "strong feelings" on the death penalty, had "never thought about it," and "didn't seem to know if there's any social purpose to it." Under these circumstances, the prosecutor explained, "I just wasn't sure she would be able to impose the death penalty." The court cautioned that it was required to determine whether the prosecutor was "making a systematic exclusion [of] . . . a certain class of people." The prosecutor responded that he was "systematically excluding people not strong in the death penalty."

---

elaboration, that she believed the earlier *Marsden* motion had merit. Fuller further testified that Judge Ferguson told her she could "protect" herself by limiting herself to research duties.

However, these claims were not corroborated by Judge Ferguson, who also testified at the settlement hearing. As we earlier concluded, the settled statement's resolution of the factual issues is supported by substantial evidence. Thus the statement, not any arguably contrary testimony at the settlement hearing, constitutes the binding appellate record. (See *People* v. *Hawthorne* (1992) 4 Cal.4th 43, 65-66 [14 Cal.Rptr.2d 133, 841 P.2d 118].)

Fuller also explained at the settlement hearing that when she spoke to Judge Ferguson, she was particularly concerned about Birchfield's failure to pursue a petition for habeas corpus challenging the competency of counsel at the 1979 guilt trial. She also indicated she did not tell defendant the true reason for her desire to limit her trial role. But Fuller did not claim she communicated these facts to Judge Ferguson. Thus, they are irrelevant on appeal as beyond the scope of the unreported court proceeding subject to settlement. The appellate record cannot be augmented in this fashion. (See *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 585-586 [15 Cal.Rptr.2d 382, 842 P.2d 1142].)

In any event, even if we credited Fuller's claims, they would not alter our conclusions that no reversible conflict of interest occurred, and that no further *Marsden* inquiry was required.

In support of his position, the prosecutor sought to compare Gomez's views with those of Gutierrez and of prospective jurors Duane Nelson (who had not yet been challenged, but was later excused by the People) and Pamela Guimarra (who sat on the jury). The court indicated its recollection that Gomez's death penalty opinions were "right in the middle" and that "about 11 [other prospective jurors]" had expressed similar views. Again invoking its "duty" to prevent a systematic class exclusion, the court remarked that the prosecutor was "treading on dangerous ground."

After further dialogue, the court stated its concern that mere neutrality on the death penalty was not a "specific bias" which would justify a peremptory excusal over a *Wheeler* challenge. On the other hand, though expressing its determination to avoid the "ridiculous" situation of "built-in . . . [pretrial] reversible error," the court indicated a tentative view that there was no "systematic" exclusion of Hispanic jurors.

To test this latter assumption, the court invited the prosecutor to state his reasons for excusing Gutierrez, but then briefly recessed to reread *Wheeler*. When proceedings resumed, the court announced it was "sure" that defense counsel "[had] . . . not shown a systematic exclusion of [H]ispanics" but had merely "[raised] the issue," and that "the burden [was] . . . on him" to show the prosecutor's systematic misuse of challenges. By "taking up this point," the court cautioned, it had not intended to suggest otherwise.

With the court's permission, the prosecutor then returned to the issue of Gutierrez's excusal. The prosecutor indicated that Gutierrez had been challenged because of defense counsel's off-the-record disclosure that he had represented Gutierrez's brother-in-law in a drug case.

The prosecutor reminded the court that because the instant case involved a "Chicano victim" (Gregorio) and a "Chicano witness" (Gregorio's grandson David), he would "just as soon" have jurors from "[that] community," but "I have other factors to take into account." Defense counsel confirmed that he was not "including [Gutierrez] within the motion that there's some systematic exclusions."

The court then stated its continuing concern that death penalty neutrality was not a "specific bias" which justified peremptory excusal of members of a particular class, but also found that the prosecutor had "certainly shown" a valid reason for Gutierrez's removal. Though "Gomez is a little fuzzier," the court ruled, "at least [the prosecutor] had a reason . . . other than . . . race [for excusing Gomez]." The court again indicated to defense counsel that "I don't think you've shown" systematic exclusion. On this basis, the court denied defendant's *Wheeler* objection.

The prosecutor ultimately exercised 13 peremptory challenges, as did the defense. No other Hispanic-surnamed juror was excused peremptorily by the prosecution, and defendant's counsel did not challenge any later excusal. At least one Hispanic-surnamed person, Rubin Sanchez, sat on the jury.[7]

 The California Constitution forbids the use of peremptory challenges to discriminate against members of a "cognizable" racial, religious, ethnic, or other identifiable group. (*Wheeler, supra*, 22 Cal.3d 258.) The federal Constitution similarly proscribes discriminatory challenges on the basis of race. (*Powers, supra*, 499 U.S. 400; *Batson, supra*, 476 U.S. 79.) A party who suspects improper use of peremptory challenges must raise a timely objection and make a prima facie showing of strong likelihood that the opponent has excluded one or more jurors on the basis of group or racial identity. The burden then shifts to the opponent to show that he or she had genuine nondiscriminatory reasons for the challenges at issue. (*People* v. *Fuentes* (1991) 54 Cal.3d 707, 714 [286 Cal.Rptr. 792, 818 P.2d 75]; *Wheeler, supra*, 22 Cal.3d at pp. 280-281; see *Batson, supra*, 476 U.S. at pp. 96-98 [90 L.Ed.2d at pp. 87-89].)

If the trial court makes a "sincere and reasoned effort" to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. In such circumstances, an appellate court will not reassess good faith by conducting its own comparative juror analysis. Such an approach would undermine the trial court's credibility determinations and would discount " 'the variety of [subjective] factors and considerations,' " including "prospective jurors' body language or manner of answering questions," which legitimately inform a trial lawyer's decision to exercise peremptory challenges. (*Fuentes, supra*, 54 Cal.3d at pp. 714-715; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1216-1221 [255 Cal.Rptr. 569, 767 P.2d 1047], disapproving *People* v. *Trevino* (1985) 39 Cal.3d 667 [217 Cal.Rptr. 652, 704 P.2d 719]; see *Batson, supra*, 476 U.S. at p. 98, fn. 21 [90 L.Ed.2d at pp. 88-89].)

 As the People now appear to concede, the trial court was mistaken in its belief that only multiple, "systematic" discriminatory exclusions are forbidden. California law makes clear that a constitutional violation may arise even when only one of several members of a "cognizable" group was improperly excluded. (*Fuentes, supra*, 54 Cal.3d at pp. 714-715, fn. 4.) Federal authority also suggests that individual exclusions on racial grounds may be improper. (*Id.*, at p. 715, and authorities cited.)

---

[7]The People claim on appeal that the final jury included no fewer than six Hispanic members. Though no record was made on the issue, it appears the jury contained no more than three jurors besides Sanchez with possibly Hispanic surnames: Carolyn Boado, Pamela Guimarra, and Diane Vallicella.

However, even if the prosecutor was required to justify, and the trial court to evaluate, his excusal of Gomez alone,[8] we may properly uphold the court's ultimate denial of defendant's motion. As we have seen, the court mistakenly believed that discriminatory excusal of a single juror was not forbidden (see discussion, *ante*); on the other hand, it had the equally mistaken impression that the reason given for excusing Gomez, even if genuine, did not demonstrate a "specific [juror] bias" necessary to rebut a group-bias challenge.[9] Nonetheless, contrary to defendant's contention, it appears that the court correctly resolved the true issue. The record could and should be clearer, but read as a whole, it indicates that the court credited the prosecutor's nondiscriminatory explanation after making a "sincere and reasoned effort" to evaluate his good faith.

Thus, the court did not simply accept the prosecutor's reason at face value; at the outset, the court noted skeptically that other prospective jurors not yet excused had expressed death penalty views similar to those of Gomez. The prosecutor gave a vigorous defense of his good faith, compared Gomez's responses to those of other specific prospective jurors, reiterated his view that Gomez's opinions were particularly vague, and offered to reveal his evaluations of all persons thus far challenged. The court specifically asked the prosecutor to justify his prior excusal of another prospective Hispanic juror, Gutierrez. During this discussion, the court apparently came to accept that the reason given by the prosecutor for Gomez's excusal was genuine, and the court's concern then turned to the legal sufficiency of the reason. The court's ultimate acceptance of the prosecutor's sincerity is further shown by its comment, in denying defendant's motion, that "at least

---

[8]We have suggested that the trial court's express or implied finding of a prima facie case is conclusive, that the court makes such a finding implicitly when it "inquires about [a party's] justifications" for challenged excusals, that its subsequent attempts to disclaim a prima facie finding are of no effect, and that the only remaining issue is whether the justifications offered were satisfactory. (*Fuentes, supra*, 54 Cal.3d at pp. 716-717.) To avoid confusion on these issues, we have emphasized that trial courts "should in every instance make an express determination whether or not the prima facie showing requirement has been met." (*Id.*, at pp. 716-717, fn. 5.) We do so again.

[9]The trial court apparently believed that a group-bias objection can be rebutted only by a showing that the juror in question expressed some *positive prejudice or bias* unfavorable to the excusing party. However, though *Wheeler* distinguished the "specific bias" which justifies excusal from the "group bias" which does not, neither *Wheeler* nor *Batson* overturned the traditional rule that peremptory challenges are available against individual jurors whom counsel suspects even for trivial reasons. (*Johnson, supra*, 47 Cal.3d at pp. 1218-1219.) To rebut a race- or group-bias challenge, counsel need only give a *nondiscriminatory* reason which, under all the circumstances, including logical relevance to the case, appears *genuine* and thus supports the conclusion that race or group prejudice *alone* was not the basis for excusing the juror. (See *People* v. *Hall* (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854]; *Wheeler, supra*, 22 Cal.3d at pp. 274-276, 278-282; see also *Batson, supra*, 476 U.S. at pp. 97-98 [90 L.Ed.2d at pp. 88-89].) Here, if Gomez's indifference to the death penalty was a genuine basis for her excusal, it was a permissible one.

[the prosecutor] *has* a reason other than . . . race" for excusing Gomez. (Italics added.)

The trial court thus met its obligation to determine that the prosecutor's excusal of Gomez did not stem solely from her racial or ethnic identity. The court's negative finding on that issue is substantially supported and must therefore be accepted on appeal. Accordingly, we reject defendant's claim that his challenge to Gomez's excusal was erroneously denied.

### 3. *Failure to challenge and excuse Juror Binns.*

■ During voir dire, Patricia Binns, who sat on the jury, expressed the "adamant" view that "if you make the choice to use [drugs] . . . , then you're totally responsible for that choice you made." Because of this statement, defendant claims his trial counsel was constitutionally ineffective for failing to exercise a peremptory challenge against Binns. The record does not support his contention.

A claim of ineffective assistance will not be accepted on direct appeal unless the appellate record makes clear that the challenged act or omission was a mistake beyond the range of reasonable competence. (E.g., *People* v. *Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; *People* v. *Pope* (1979) 23 Cal.3d 412, 426-427 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Because the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process.

The overall tenor of Binns's voir dire established her ability and desire to be fair on the issue of penalty. She professed that she could "follow the law," "go either way" based on the guidelines given to her, "evaluate [the evidence] and make a choice," judge expert psychiatric evidence, and use her common sense. While she stated that persons were "responsible" for the consequences of their choice to use drugs, she never indicated that a defendant's voluntary drug ingestion would prevent her from choosing life without parole, rather than death, as the appropriate punishment for a capital crime.

Under these circumstances, the record discloses no manifest incompetence in counsel's decision to retain Binns, which was presumably based on his overall impression of her personality and values. Defendant's claim of ineffective assistance must be dismissed.

### 4. *Voir dire comments that evidence and issues would be limited.*

■ During both the death qualification and general voir dires, the prosecutor often reminded panelists that defendant had already been found guilty

of first degree murder with special circumstances, that the law limited the current trial to penalty issues only, and that jurors would thus not hear all the guilt evidence which had previously been presented. The prosecutor asked if these limitations would make it more difficult to impose the death penalty. Specific inquiries of this type were made to Jurors Hillis, Reinelt, and Guimarra.

Defendant argues that this was misconduct which prejudiced his Eighth Amendment right to a penalty jury fully aware of its sentencing responsibilities. (Citing *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633].) Defendant also asserts that the prosecutor's improper comments prejudiced his mitigating case of mental impairment and intoxication (§ 190.3, factor (h)) and precluded the affected jurors from considering lingering doubt of his guilt in mitigation (see *People* v. *Terry* (1964) 61 Cal.2d 137, 145-147 [37 Cal.Rptr. 605, 390 P.2d 381]).

At the outset, defense counsel's failure to object and request appropriate admonitions waives the direct claim of misconduct. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) In any event, defendant has shown no basis for disturbing the penalty judgment.

By reminding prospective jurors that guilt of capital murder had already been determined, and that the proper penalty was the only remaining issue, the prosecutor did nothing improper. In its opening comments to the entire panel, the court itself had made the same true and obvious point. We have consistently held that accurate reminders of a separate penalty jury's limited role do not eliminate the defendant's ability to litigate lingering doubt. (See *People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1238-1239 [9 Cal.Rptr.2d 628, 831 P.2d 1210]; *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1234-1235 [275 Cal.Rptr. 729, 800 P.2d 1159].) Nor are we persuaded that a penalty jury's sense of *sentencing* responsibility is necessarily diminished by the knowledge that another jury has already rendered a conclusive judgment of *guilt*.

Under the circumstances of this case, we reach a similar conclusion about the prosecutor's suggestions that "all" the guilt evidence would not be reintroduced. In general, of course, the prosecutor should not allude to additional evidence he cannot or will not present, thus leaving jurors to speculate that the People have, or a prior jury heard, a stronger case. Moreover, a "tension" may arise between a penalty defendant's right to exploit lingering doubt and the preference not to reproduce all the guilt evidence at a second penalty trial. (*DeSantis, supra,* 2 Cal.4th at p. 1239.)

Here, however, the jury could not reasonably have understood the prosecutor's remarks to undermine any lingering doubt or other penalty issue that

defendant actually sought to exploit. Because defendant's *identity* as Gregorio's robber and killer was beyond dispute, defendant expressly conceded that point.[10] The only remaining guilt issues on which the penalty jury might exercise lingering doubt were whether defendant formed the specific mental states, such as premeditation and intent to rob, which supported the charges of capital robbery-murder.

But highly similar mental-state issues were the heart of both the prosecution and defense cases on penalty. The defense strategy was to focus on whether defendant's intoxication at the time of the murder made the crime less heinous and suggested leniency. Both prosecution and defense presented full-dress cases on that issue. Each offered extensive evidence and argument on whether defendant was so intoxicated that he could not have understood, intended, premeditated, or controlled his acts.[11] The jury was specifically instructed to consider "[w]hether . . . the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the effects of intoxication." (§ 190.3, factor (h).)

The jurors were not likely to infer that because of their limited penalty role, the prosecutor was withholding significant evidence on this crucial question. Instead, a reasonable juror would assume that while defendant's *identity* as Gregorio's robber and killer need not be fully relitigated, all evidence about the offense and offender which bore on the appropriate penalty would be fully presented. We see no reasonable likelihood that any juror believed the prosecution was omitting mental-state evidence adverse to defendant.[12] Hence, we cannot conclude that the prosecutor's remarks impaired the jury's ability to entertain lingering doubt, or to consider defendant's claim that his intoxication extenuated his crime.

---

[10] For example, counsel asked defendant on the stand whether "while you were at San Quentin, your thoughts ever turn[ed] towards the person that you murdered in the early part of 1979." Defendant answered, "Yes, [they] did." Counsel then questioned defendant at some length about his remorse for the killing.

[11] For example, defense counsel's closing argument broke defendant's life down into three phases, his childhood and youth, "the time that he murdered Mr. Ante," and his life in prison. Counsel asserted that the issue was "what was or was not in Mr. Montiel's brain at the time Mr. Ante was murdered." He stressed that defendant went into the victim's house without a weapon and missed a substantial sum of money in the victim's pocket even after ransacking the house. "We're talking about simply this," counsel said, "Did these drugs have an effect on Mr. Montiel, his behavior and the actions that he performed, and if so, what is the extent of that problem caused by drugs[?]"

[12] We are not persuaded otherwise by the fact that on a single occasion during voir dire, the prosecutor questioned the entire panel as follows: "As I told you before, I asked the fact that you had not considered and heard the previous case where guilt was decided if it would prevent you from imposing a death penalty. [¶] Let me ask, the fact that you won't be hearing all the evidence that the previous jury heard *about the death penalty*—we're limited to only go to what the proper penalty for this trial [is]. [¶] The fact that you won't hear all that other

5. *Voir dire comments about defendant's neat courtroom appearance and victim's absence.*

During general voir dire of a panel which included Jurors Barnett, Renz, Boado, Reinelt, and Sanchez, the prosecutor remarked that it would be proper to consider "sympathetic factors" in defendant's favor, but that defendant would be appearing in court "dressed up and decent" and had "over six years to get ready for today." The prosecutor continued in a similar vein that "[w]hat you're not going to have is . . . the victim appear[ing] in court, and it's easy to lose—." At this point, defense counsel interrupted with an objection, which was sustained. Counsel did not request an admonition, however, and none was given.

█ Defendant asserts that these comments were misconduct calculated to inflame the jurors, dispel sympathy generated by defendant's respectful courtroom appearance, call attention to a nonstatutory aggravating factor (i.e., the homicide victim's death), imply defendant's connivance against the judicial system, and penalize his exercise of his constitutional jury trial rights.

The contention is barred. As defendant concedes, trial counsel failed to preserve a direct claim of misconduct because, although he objected to the prosecutor's remarks, he did not also request an admonition that would clearly have cured any harm. (*People* v. *Bonin* (1988) 46 Cal.3d 659, 689 [250 Cal.Rptr. 687, 758 P.2d 1217]; *People* v. *Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]; see *People* v. *Green, supra,* 27 Cal.3d 1, 34.)

Defendant asserts that the trial court should have intervened sua sponte to prevent or cure misconduct by the prosecutor. Our cases hold the contrary (*People* v. *Carrera* (1989) 49 Cal.3d 291, 321 [261 Cal.Rptr. 348, 777 P.2d 121]; *People* v. *Poggi* (1988) 45 Cal.3d 306, 335-336 [246 Cal.Rptr. 886, 753 P.2d 1082]), and defendant offers no persuasive reason to reconsider them.

Defendant also suggests the claim is cognizable in the context of ineffective assistance of counsel. However, the appellate record does not eliminate the possibility that counsel's omission was tactical. (See *People* v. *Pope, supra,* 23 Cal.3d 412, 425-426.) For all that appears, counsel may have been

evidence, is that going to make it difficult for someone to impose the death penalty situation in this case?" (Italics added.) It appears clear in context that the prosecutor realized he had misspoken and immediately made clear that he was not withholding penalty evidence, but rather was limited to evidence on penalty issues.

willing to forgo an appellate claim in hopes that a successful objection alone would ameliorate the prosecutor's remarks without highlighting them further.[13]

In any event, the prosecutor's comments, brief in duration, did not call attention to anything jurors would not readily infer in any event. The jurors already well knew that the victim was dead and that the murder had taken place several years previously. They would certainly assume that defendant would groom neatly for court and that his appearance had changed since the crime was committed.[14] By sustaining defense counsel's objection, the court immediately signalled that the prosecutor's remarks were improper. The incident occurred at the outset of trial proceedings, long before deliberations began. Just before the jury retired, it received instructions, among others, to disregard "evidence" that had been "stricken," and to avoid speculation about gaps caused by successful objections. For these reasons, any omission by counsel does not undermine confidence in the penalty judgment. (*Strickland* v. *Washington, supra,* 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698]; see *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].) Hence, there is no basis for reversal.

TRIAL ISSUES

1. *1971 county fair arrest.*

Defendant claims his state and federal rights to due process, a fair trial, and a reliable penalty determination were violated by admission of evidence of his resistance to arrest at the Kern County Fair in 1971. In essence, defendant contends that the evidence was insufficient to show "violent" criminal activity in aggravation (§ 190.3, factor (b) (hereafter factor (b))) because it failed to establish all the elements of a criminal assault. (§ 241, subds. (a), (b).) In defendant's view, Deputy Leavell's testimony about their scuffle was "ambiguous," did not indicate that defendant was the "aggressor," and suggested a mere struggle to escape without any "attempt . . . to commit . . . violent injury . . . ." (§ 240.)

The jury was carefully instructed on the elements of assault stemming from violent resistance to arrest, and we find ample evidence from which it

---

[13]Indeed, the jury received general instructions not to speculate about the reasons for objections or the answers to questions as to which objections had been sustained, and to disregard any "evidence" that was "stricken out" by the court or any "offer of evidence" that was "rejected."

[14]Indeed, while the prosecutor may have acted improperly by attempting to influence prospective jurors during the voir dire process, the contents of his remarks might not have been improper in all contexts. We have held that the prosecutor, during appropriate argument to the jury, may urge it not to consider "free-floating" emotional responses which are not connected to the penalty evidence. (*People* v. *Gonzalez, supra,* 51 Cal.3d 1179, 1226.)

could infer violent criminal activity. If one knows or should know he is being arrested by a peace officer, he has a duty to refrain from forcible resistance. (§ 834a; see also § 148 [resisting peace officer in exercise of "duty" is misdemeanor].) The use of violence to overcome reasonable force employed in a lawful arrest is an assault. (See *People* v. *Gonzalez, supra,* 51 Cal.3d 1179, 1219.)

Leavell testified that he assumed custody of defendant after other officers saw defendant commit an apparent theft and arrested him. According to Leavell, defendant then escaped, but, after a short chase, he caught up with defendant; Leavell's momentum caused both men to fall to the ground; a short "fight" then occurred, of which Leavell was the "winner," and defendant was handcuffed.

This evidence readily supports the inference that defendant knew or should have known he was being arrested by a peace officer, responded forcibly to Leavell's reasonable and lawful efforts to subdue him, and thus committed an assault. Since defendant had no privilege of self-defense against Leavell's use of reasonable force, concerns about who was the "aggressor" (compare *People* v. *Tuilaepa, supra,* 4 Cal.4th 569, 587-588; *People* v. *Lucky* (1988) 45 Cal.3d 259, 291 [247 Cal.Rptr. 1, 753 P.2d 1052]) are irrelevant.

Defendant also contends that evidence about his threats to arresting Officers Leavell and Williams were inadmissible nonstatutory aggravating evidence. (See *People* v. *Boyd* (1985) 38 Cal.3d 762, 777-778 [215 Cal.Rptr. 1, 700 P.2d 782].) He makes the novel additional contention that the use, in aggravation, of these ineffectual, merely "obnoxious" utterances violated his state and federal free speech rights.

Counsel's failure to object bars these contentions as direct appellate issues. Furthermore, because the "threat" evidence was admissible, the record does not demonstrate counsel's incompetence.

Defendant argues that his menacing statements were not "actual crimes" involving the "threat [of] . . . violence" (factor (b); see *People* v. *Phillips* (1985) 41 Cal.3d 29, 70-72 [222 Cal.Rptr. 127, 711 P.2d 423]) because there was no showing he spoke with intent to prevent his arrest and with the apparent ability to carry out his threats. (See § 71 [threatening public official].) However, it is well settled that an "actual" violent crime admissible under factor (b) may be shown in full context. (*People* v. *Melton* (1988) 44 Cal.3d 713, 757 [244 Cal.Rptr. 867, 750 P.2d 741].)

Even if defendant's threats were not themselves crimes, they occurred in the course of a violent, criminal resistance to arrest (see discussion, *ante,* p.

916), and they were thus admissible under factor (b) to demonstrate the aggravated nature of defendant's unlawful conduct. (See *People* v. *Tuilaepa, supra,* 4 Cal.4th at pp. 587-588.) Nor were defendant's constitutional rights infringed by the evidentiary use of his "obnoxious" speech for this purpose.

### 2. *Foster Freeze firearm.*

■ Defendant claims there was legally insufficient evidence he used a lethal handgun, rather than a harmless starter pistol, during the 1972 Foster Freeze robbery. Hence, he urges, the jury should not have been instructed on the crime of assault with a deadly weapon (§ 245) in connection with that aggravating incident. He further insists the prosecution committed prejudicial bad faith, amounting to a due process violation, by attempting to show use of a true firearm.

The evidence of firearm use was sufficient. Defendant brandished a handgun at Denise Brown, who said it "looked real." When fleeing the scene, he actually fired the weapon at Ronald Jones, who heard two shots and ducked. Evidence that Jones suspected the gun was a starter pistol, and that he heard no bullets, hardly compels the inference that the gun was not real.[15]

Moreover, the 1986 trial record demonstrates no bad faith on the prosecution's part. The 1972 abstract of judgment demonstrates at most that defendant pled guilty to a second degree robbery in connection with the Foster Freeze incident, and that weapon and firearm enhancements were not included. It is well-settled that the charges to which defendant pled guilty in a prior case do not limit the aggravating evidence the prosecution may present in a subsequent capital trial. (*People* v. *Melton, supra,* 44 Cal.3d 713, 755-756.)[16]

---

[15]Defendant suggests his own counsel was prejudicially ineffective when, while cross-examining Jones about the shots fired by defendant, he asked whether Jones had fallen down "[i]n order to duck the bullets." Jones replied, "Yes." Defendant argues counsel thus assumed adverse facts about the existence of "bullets" that were not in evidence. However, in context, this brief exchange suggested only that Jones had ducked reflexively because of the chance that the gun might be real. Defendant also cites counsel for failing to highlight Jones's 1979 testimony that no bullet holes were found in the area. However, the omission had only marginal effect on the strength of the prosecution evidence.

[16]The printed judgment form included provision for indicating whether the pleading defendant "was or was not" armed or "used or did not use" a firearm in his commission of the offense. The relevant blanks were filled in with the words "was not" and "did not use." However, contrary to defendant's inference, these statements did not constitute formal "acquittals" on the weapon and firearm issues. (See § 190.3, par. 3.) They merely indicated enhancements that *were not included* in the plea. (Cf., *Melton, supra,* 44 Cal.3d at p. 755.)

To support his claim of bad faith, defendant points to comments by the prosecutor during the first 1979 penalty trial that the 1972 offense "appeared" to involve a starter pistol, that no bullet holes were found, and that "the presumption was that [the robbery] was a second degree, [which] . . . is what he pleaded to." But nothing in these remarks precluded the prosecution from reevaluating the strength of its aggravating evidence between 1979 and 1986.

In any event, the potential for prejudice was minimal at most. The jury could evaluate the relative weakness of the handgun evidence. Moreover, as defendant concedes, even if he used only a starter pistol, he brandished and fired it to facilitate a robbery, thus committing a serious offense involving "violence or the express or implied threat [of] . . . violence." (§ 190.3, factor (b).) Under these circumstances, any inference that the gun was not real would make the incident only marginally less aggravating. Given the brutal nature of the capital murder and the other evidence of defendant's violence and recidivism, admission of "real gun" evidence thus cannot have affected the penalty outcome.

### 3. *Siegel testimony.*

██ Defendant complains that his confrontation, due process, fair trial, and reliable-penalty rights were violated when Dr. Siegel, the prosecution drug expert, disclosed prejudicial hearsay information while explaining his conclusions on direct examination. Defendant accuses the prosecutor of using Dr. Siegel as an improper means of introducing hearsay for truth. Defendant blames the court and his trial counsel for failing to intervene.

However, the trial court had no sua sponte duty to exclude evidence, remedy misconduct, or instruct the jury on specific evidentiary limitations. (See discussion, *ante*, pp. 914-915; see also *People* v. *Clark* (1992) 3 Cal.4th 41, 130-131 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People* v. *Collie* (1981) 30 Cal.3d 43, 64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].) Thus, counsel's failure to act waived direct claims of error. On the other hand, we find no incompetence warranting reversal.

An expert may generally base his opinion on any "matter" known to him, including hearsay not otherwise admissible, which may "reasonably . . . be relied upon" for that purpose. (Evid. Code, § 801, subd. (b); *In re Fields* (1990) 51 Cal.3d 1063, 1070 [275 Cal.Rptr. 384, 800 P.2d 862].) ██ On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them. However, prejudice may arise if, " 'under the guise of reasons,' " the expert's detailed explanation " '[brings] before the jury incompetent hearsay evidence.' " (*People* v.

*Nicolaus* (1991) 54 Cal.3d 551, 583 [286 Cal.Rptr. 628, 817 P.2d 893], quoting *People* v. *Coleman* (1985) 38 Cal.3d 69, 92 [211 Cal.Rptr. 102, 695 P.2d 189].)

Because an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion, may conflict with an accused's interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court's sound judgment. (*Nicolaus, supra,* 54 Cal.3d at p. 582; see *People* v. *Cole* (1956) 47 Cal.2d 99, 105 [301 P.2d 854, 56 A.L.R.2d 1435].) Most often, hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth. (*Coleman, supra,* 38 Cal.3d at p. 92.)

Sometimes a limiting instruction may not be enough. In such cases, Evidence Code section 352 authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value. (*Coleman, supra,* 38 Cal.3d at pp. 91-93.)

Here, the jury received CALJIC No. 2.07, which instructed that some evidence had been admitted for a limited purpose and must be considered accordingly. However, this instruction was never tied to particular evidence, and the jury's attention was never drawn to specific hearsay information disclosed by expert witnesses which should only be considered as a basis for evaluating their opinions. With this background in mind, we proceed to defendant's individual claims.

a. *Use and sale of other drugs.*

In response to the prosecutor's questions, Dr. Siegel recited the extensive drug history defendant, then age 31, had given him in 1979. Dr. Siegel stated that at various times since age 13, defendant had used or experimented with glue, alcohol, LSD, amphetamines, cocaine, barbiturates, marijuana, Quaaludes, heroin, and PCP. When the prosecutor asked, "What else did he tell you about this PCP?", Dr. Siegel replied that at age 29, defendant was smoking several PCP-laced "joints" per day and using heroin when it was around; that "[defendant] also said . . . he [would sell] slam and then he would use the dust."

 Defendant has no valid hearsay complaint about this evidence. As his own extrajudicial statement, it fell within the hearsay exception for admissions by a party. (Evid. Code, § 1220.)

Defendant also claims, however, that the references to drugs other than alcohol and PCP, and the assertion that he "sold slam," were irrelevant to Dr. Siegel's ultimate opinion about the effects of PCP and alcohol ingestion on defendant's mental state when he killed Gregorio. These disclosures, he urges, constituted nonstatutory aggravating evidence (see *People v. Boyd, supra*, 38 Cal.3d 762, 777-778) that he was a seller and "hedonistic" abuser of drugs.

However, Dr. Siegel was entitled to place his conclusions in the context of defendant's overall pattern of drug use. When the prosecutor asked whether "someone who starts out in this kind of lifestyle" might ultimately require more PCP or alcohol to become intoxicated, Dr. Siegel confirmed that defendant's "whole history" was relevant; a "chronic drug user" who was "trying to maintain a chronic state of intoxication" might need more or less of a particular drug to achieve certain toxic effects.

Dr. Siegel's reference to defendant's use of other drugs was thus not improper. Moreover, there was little danger that, by considering this evidence for its truth, the jury would come to irrelevant but prejudicial conclusions about his "hedonistic" drug abuse. The central theory of both defense and prosecution cases was that defendant was a lifelong abuser of drugs. The only dispute was the impact of this chronic abuse on his state of mind at the time of the capital crime.

Similar considerations rebut defendant's claim that the disclosure about selling "slam" was prejudicial. Dr. Siegel's revelation on this subject may have been both nonresponsive and irrelevant, but the remark was brief, and the information it disclosed could hardly have come as a surprise to jurors already aware of defendant's drug-centered lifestyle. Hence, admission of evidence about defendant's drug history, even without a limiting instruction, does not undermine confidence in the penalty judgment.

### b. *References to 1979 informant testimony.*

Dr. Siegel testified at length about the descriptions defendant, Victor Cordova, and others had given him of events on the day of Gregorio's murder. The prosecutor asked whether Dr. Siegel also considered how these versions might "contrast" with what defendant told Michael Palacio, his jail cellmate. Dr. Siegel confirmed he had considered Palacio's 1979 trial testimony.

As Dr. Siegel told it, Palacio gave the following account of defendant's statements: Defendant entered Gregorio's home to use the telephone and saw

money sticking out of Gregorio's pocket. Defendant then formed the intent to kill Gregorio for the cash and went to the kitchen to get a knife. After leaving the house, defendant asked Victor to go back and retrieve his beer, then did so himself after Victor declined. Defendant returned a second time with the beer and a "bulging" pocketful of coins he had not taken before.

Dr. Siegel said this information "tells me that while . . . [defendant] . . . [was] . . . obviously grossly intoxicated, he also [was] . . . capable of some goal direction activity. . . ." In his closing argument, the prosecutor again noted Palacio's claim that defendant admitted forming the intent to rob and kill.

 Even so, counsel's failure to pursue a hearsay objection was not facially incompetent. As counsel must have known, a successful objection probably would not have prevented Palacio's account from reaching the jury. In that event, the People could, and likely would, have chosen to present Palacio in person, or if he was unavailable, to introduce his 1979 testimony directly under the unavailable-witness exception to the hearsay rule. (Evid. Code, § 1291, subd. (a)(2).) Either alternative would only have emphasized Palacio's claim that defendant committed a premeditated killing. Given these tactical considerations, the record fails to demonstrate that counsel's silence in the face of Dr. Siegel's hearsay report constituted ineffective assistance.

Moreover, even if counsel should have objected, reversal is not warranted. While Palacio's assertions were the only direct evidence that defendant consciously formed a criminal intent before he killed Gregorio, the valid circumstantial evidence that defendant knew what he was doing was extremely strong.

The manner of killing suggested calculation and awareness. It was also clear that defendant had ransacked Gregorio's residence and taken money. Moreover, Victor testified that moments after the crime, defendant described it several times in graphic and coherent terms. Victor also indicated that defendant carried away the murder weapon and immediately returned to the house to retrieve other evidence which might link him to the homicide. Defendant continued to boast about the killing as he was driven away from the scene. He later asked Victor to lie about the extent of his intoxication. ▬ ██ Under these circumstances, admission of the Palacio evidence without a limiting instruction does not undermine confidence in the judgment.[17]

---

[17]Defendant raises the novel contention that because defendant's 1979 "confession" to Palacio was erroneously admitted, the penalty judgment is reversible per se. He urges that the

### c. *Psychiatric reports.*

 We reach similar conclusions about defendant's complaint that the prosecutor wrongly elicited from Dr. Siegel the hearsay details of prior unfavorable psychological reports. When the prosecutor asked Dr. Siegel whether he considered "any prior psychological evaluations," the witness replied that he was provided with several psychological assessments of defendant between 1972 and 1978. According to Dr. Siegel, these reports "talked words such as potential for violence" and suggested that defendant demonstrated "bravado, manipulation, and aggression." "Apparently," Dr. Siegel suggested, "[defendant] had a long history [during these years] with descriptors like that being used."

Even if counsel should have sought to prevent independent consideration of these hearsay matters (see, e.g., *Whitfield* v. *Roth* (1974) 10 Cal.3d 874, 894-895 [112 Cal.Rptr. 540, 519 P.2d 588]), his omission is not grounds for reversal. According to Dr. Siegel, defendant himself described "fights he had gotten into" and "wasn't denying" that he was prone to violence, whether or not intoxicated. Dr. Siegel indicated that the only dispute was about interpretation; defendant's view was "that he only did it when he was provoked or when he needed to put some dude in line." The generalities contained in the psychological evaluations, as described by Dr. Siegel, were not inconsistent with defendant's own admissions. Thus, revelation of these matters does not undermine confidence in the penalty judgment.[18]

---

new harmless error rule of *Arizona* v. *Fulminante* (1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246] (see also *People* v. *Cahill* (1993) 5 Cal.4th 478, 500-510 [20 Cal.Rptr.2d 582, 853 P.2d 1037]) should not apply "retroactively." The claim is meritless. Even if the former per se rule applied to statements not obtained by improper police conduct, and even if it applied in the context of ineffective assistance of counsel—both highly dubious propositions for which defendant cites no authority—his substantive rights are not compromised by invoking new rules of harmless error here. (See, e.g., *Cahill, supra,* 5 Cal.4th at p. 510; *People* v. *Sims* (1993) 5 Cal.4th 405, 447-448 [20 Cal.Rptr.2d 537, 853 P.2d 992].)

[18]Similar considerations dispose of defendant's claim that his counsel was ineffective for failing to challenge or limit Dr. Siegel's disclosure that within days before the murder, defendant had "punch[ed] out" the window of a relative's residence to gain entry to the premises. In Dr. Siegel's view, this physical response to small frustrations was just another example of "the way [defendant] was at that time." The information, supplied by defendant himself, was an appropriate foundation for Dr. Siegel's opinion that defendant was prone to violence whether or not intoxicated. The jury was not cautioned to avoid considering the incident as independent nonstatutory aggravating evidence, but no basis for reversal arises in view of the brevity and collateral nature of the evidence.

More generally, defendant claims that admission of expert evidence about his "potential for violence" contravened our holding in *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446]. There we concluded that psychiatric predictions about *future* dangerousness are not admissible as evidence directly bearing on the appropriate penalty in a capital case. (*Id.,* at pp. 767-775.) However, nothing in *Murtishaw* prevents an expert witness

### 4. *Nuernberger testimony.*

In a similar vein, defendant complains that through cross-examination of the defense psychiatric expert, Dr. Nuernberger, the prosecutor improperly introduced, for their truth, the unfavorable hearsay details of 1979 testimony by another defense expert, Dr. Cutting. Defendant claims a violation of his confrontation rights, and also asserts that the prosecutor made wrongful use of privileged information. All these contentions must be rejected.

Prior to the 1979 trials, Dr. Cutting had been appointed at defense request to evaluate mental issues. Defendant called Dr. Cutting as a witness at his 1979 insanity trial, purporting to waive his psychotherapist-patient privilege (Evid. Code, § 1014) only for that purpose. Dr. Cutting then testified that, at the time he examined defendant, he found no mental disease or defects which would substantially impair defendant's capacity to evaluate or control his behavior. Dr. Cutting also said that evidence of defendant's intoxication on the day of the murder would not change his opinion.

While cross-examining Dr. Nuernberger at the 1986 trial, the prosecutor asked if he had reviewed any report or testimony of Dr. Cutting. When Dr. Nuernberger said he had not, the prosecutor described Dr. Cutting's 1979 testimony and asked whether Dr. Nuernberger would consider Dr. Cutting's assessment, based on an examination undertaken within two months of the murder, in forming his own opinion. Dr. Nuernberger replied he would "consider" the earlier view but not be bound by it. In his closing argument, the prosecutor made significant reference to the 1979 testimony of "defense witness" Cutting, "ignored by Dr. [Nuernberger]," in an effort to undermine the latter's credibility.

Defendant raised no hearsay or privilege objections at trial. Hence, he argues that his counsel was ineffective, and that the trial court had a duty to intervene sua sponte. His contentions lack merit.

Of course, Dr. Cutting's testimony would not have been subject to exclusion on grounds of privilege. Both parties understood that defendant's case in mitigation was primarily based on claims of his impaired mental condition at the time of the capital crime. By placing his mental state in issue at the penalty trial, defendant waived his psychotherapist-patient privilege. (Evid. Code, § 1016.)

Nor are defendant's hearsay and confrontation-clause arguments persuasive. "The courts have traditionally given both parties wide latitude

---

from using *past* indicators of the defendant's violent character to support an opinion about his mental state *at the time of the capital crime.*

in the cross-examination of experts in order to test their credibility. [Citations.] Thus, a broader range of evidence may be properly used on cross-examination to test and diminish the weight to be given the expert opinion than is admissible on direct examination to fortify the opinion. [Citation.]" (*People* v. *Coleman, supra*, 38 Cal.3d 69, 92.)

 It is common practice to challenge an expert by inquiring in good faith about relevant information, including hearsay, which he may have overlooked or ignored. Use of Dr. Cutting's testimony to attack Dr. Nuernberger's credibility was not improper cross-examination.

Of course, defendant failed to request, and the jury therefore did not receive, an instruction limiting its consideration of this evidence. However, we find the omission harmless. Contrary to defendant's claim, the prosecutor did not strongly suggest in his argument that Dr. Cutting's opinion should be given independent consideration. In the main, the prosecutor merely stressed that the worth of Dr. Nuernberger's views were diminished by his failure to consider the results of another professional evaluation undertaken closer to the time of the capital crime. Under these circumstances, the jury was unlikely to give improper substantive consideration to the hearsay evidence, and omission of a limiting instruction does not undermine confidence in the judgment.[19]

 Defendant also argues that Dr. Nuernberger's credibility was damaged by counsel's incompetent failure to prepare him for his testimony. Defendant points to Dr. Nuernberger's concessions that he had not refreshed his memory about his 1979 observations of defendant, had not more recently reviewed defendant's prison file, had not interviewed persons who observed defendant around the time of the murder, and no longer recalled in detail the facts of the crime.

---

[19]Thus, the prosecutor argued vigorously and repeatedly that Dr. Nuernberger had "shrugged off" and "ignored" the views of Dr. Cutting, "this defendant's [own] expert," when they were brought to his attention. Noting Dr. Nuernberger's assertion that he would not be controlled by the opinions of another, the prosecutor cited Dr. Cutting's views as an illustration that "Dr. [Nuernberger] wouldn't be controlled by reality if it disagreed with any of his own theories." The prosecutor hammered home the point that Dr. Nuernberger's conclusions were contradicted by the more contemporaneous and "common sense" evaluations of Drs. Cutting and Siegel. Only twice did the prosecutor seem to stray from this proper limited argument. Extolling the care and specificity of Dr. Siegel's evaluation at one point, the prosecutor remarked that "[i]t also shows you to a little lesser extent that [Dr.] . . . Cutting, the defense expert, the defense psychiatrist[,] had a basis for his opinion that the defendant was not . . . impaired at the time of his horrible murder." Later, in one of his assertions that Dr. Nuernberger had "ignored" Dr. Cutting's views, the prosecutor suggested that "[w]e have got [lack of mental impairment] . . . by the [defendant's] own witness*es*. . . ." (Italics added.) Even if these brief remarks incorrectly invited the jury to give Dr. Cutting's views independent consideration, reversal is not warranted on that basis.

But the appellate record establishes neither incompetence nor prejudice. However counsel dealt with this expert, he faced the tactical risk that too much preparation might undermine, rather than fortify, the favorable nature of the opinions the witness was willing to give. Nor may we infer on appeal that Dr. Nuernberger's testimony would have been of greater benefit to defendant had he prepared more fully. Hence, we cannot conclude that any omission by counsel undermines confidence in the judgment.

### 5. *Financial-gain special circumstance.*

As previously noted, defendant's 1979 guilt jury found two special circumstances: that the murder (1) was intentional and carried out for financial gain (§ 190.2, subd. (a)(1)), and (2) occurred in the commission of a robbery (*id.*, subd. (a)(17)(i)). In *Montiel I, supra*, we struck the financial-gain special circumstance as inapplicable to this robbery case, where the homicide was not " 'an essential prerequisite to the financial gain sought by the defendant.' " (39 Cal.3d at p. 927, quoting *People* v. *Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723].)

Nonetheless, at the prosecutor's request and with defense counsel's agreement, the instant trial court took judicial notice in the jury's presence that *both* financial-gain and robbery-murder special circumstances had previously been found true. The jury was later formally instructed that "special circumstance*s*" had specifically been sustained. (Italic added.) The prosecutor made significant reference in his closing argument to the existence and separate significance of the two special circumstances.

Defendant submits the prosecutor committed "grievous" misconduct, and the trial court serious error, by bringing the inapplicable special circumstance before the jury in direct violation of *Montiel I*. He asserts violations of the principles of collateral estoppel, due process, fair trial, double jeopardy, and reliable capital sentencing.

It appears, as defendant suggests, that both court and counsel entirely ignored and disregarded our elimination of the financial-gain special circumstance in this case. The People concede the mistake. They offer no excuse, and we perceive none. The situation is serious and deeply troubling, and a reprimand to all concerned is in order.

However, defense counsel's acquiescence waives direct claims of error and misconduct. Accordingly, defendant presents the issue in the context of ineffective assistance of his counsel, but counsel's lapse does not undermine confidence in the judgment. Even on this record, the danger that the penalty

jury would improperly "double count" any duplicative aspects of the robbery-murder and financial-gain special circumstances was minimal. The jury knew the case involved an uncomplicated robbery-murder and must have understood that the "financial gain" finding referred only to money taken in the robbery. (See, e.g., *People* v. *Adcox* (1988) 47 Cal.3d 207, 251-252 [253 Cal.Rptr. 55, 763 P.2d 906].)

The prosecutor conceded that the two special circumstances "overlap to a certain extent." Addressing the separate significance of the financial-gain finding, he said it not only indicated the "serious" crime of robbery, but also showed that the related homicide was "intentional." ▮▮ ▬ ▮ ▮ Hence, he made no improper effort to exploit those aspects of dual-use overlap which we condemned in *Bigelow* and *Montiel I*.[20]

Defendant notes that the prosecutor briefly exhorted the jury to "count" special circumstances. However, in context, the remark seems intended only to highlight the "intentional" aspect of the financial-gain finding.

We therefore conclude that the financial-gain special circumstance was not exploited, and could not reasonably have been considered, in a manner which undermines confidence in the judgment. Hence, there is no basis for reversal.

### 6. *Impeachment of family drug testimony.*

Defendant's mother Hortencia, his father Richard, Sr., and his sister Irene all testified in support of his claim that drugs had impaired his capacity to

---

[20]As we explained in *Bigelow*, the impermissible "overlap" which occurs when robbery-murder and financial-gain special circumstances are both applied to a robbery case is that the obvious motive of robbery is financial gain. We concluded that the financial-gain special circumstance applies only to that distinct category of murders, such as insurance killings and murders for hire, which are carried out "for" financial gain, i.e., in which the victim's death is a prerequisite to the financial reward. (37 Cal.3d at pp. 750-751.) However, the striking of a duplicative financial-gain special circumstance does not necessarily invalidate those aspects of the jury's findings which are unconnected to the "overlap" problem. Thus, in *Montiel I*, we found *Carlos* error (see *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], later overruled in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]) harmless because intent to kill was necessarily included in the jury's finding of an *intentional* murder for financial gain. We made clear that the striking of the financial-gain special circumstance for other reasons "does not nullify the validity of the finding that 'the murder was intentional.' " (*Montiel I, supra*, 39 Cal.3d at p. 928.) Nothing in *Montiel I* precluded this penalty jury from learning that its predecessor found an intentional killing. Contrary to defendant's claim, such comments did not preclude the penalty jury from considering, in mitigation of punishment, whether defendant killed while his moral and behavioral controls were impaired by intoxication. (§ 190.3, factor (h); see also discussion *ante*, at pp. 912-913.) Nor did reference to the prior jury's valid finding of intent to kill violate the double jeopardy clause. (Compare *Bullington* v. *Missouri* (1981) 451 U.S. 430 [68 L.Ed.2d 270, 101 S.Ct. 1852]; see *People* v. *Melton, supra*, 44 Cal.3d 713, 756, fn. 17.)

appreciate the criminality of his conduct and to behave lawfully. (§ 190.3, factor (h).) Both parents recounted that defendant acted in bizarre ways and was often delusional in the weeks before Gregorio's murder. Irene testified that two or three days before the murder, defendant was brought home unconscious from a party. The next morning, she gave defendant two PCP "joints," which he smoked.

On cross-examination, without objection, the prosecutor obtained admissions from both Hortencia and Irene that though they were witnesses at the 1979 trials, they had not previously testified about defendant's heavy drug use and its effects during the weeks before Gregorio was murdered. Richard, Sr., was not asked about his similar prior testimonial silence, but without objection, the prosecutor attacked all three witnesses on this basis in his closing argument. The prosecutor suggested that whatever the defense tried in 1979 had not worked, so it was taking "a different [tack]" this time.

 Defendant claims it was misconduct for the prosecutor to impeach these witnesses with their prior testimonial silence, because they had not been asked about his drug use and intoxicated behavior in their earlier court appearances. The prosecutor transgressed further, defendant insists, by insinuating that the defense had sought to fabricate new evidence. Defendant concedes that his counsel's failure to object waives direct attacks on the misconduct, but he asserts that counsel's inaction was ineffective assistance.

A witness "may not be impeached by showing that he omitted to state a fact or stated it less fully at a prior proceeding unless his attention was called to the matter at that time and he was then asked to testify concerning the very facts embraced in the questions propounded at the [current] trial." (*Brooks* v. *E. J. Willig Truck Transp. Co.* (1953) 40 Cal.2d 669, 675 [255 P.2d 802]; *People* v. *Lewis* (1986) 180 Cal.App.3d 816, 824 [225 Cal.Rptr. 782].) Defense counsel should have known, and the record implies he did know,[21] that Hortencia, Richard, Sr., and Irene had not previously been examined about defendant's drug use. As defendant suggests, there seems no plausible tactical reason why counsel failed to raise appropriate objections.

Nonetheless, we find no prejudice. There was no serious dispute about the gravamen of these witnesses' testimony, that defendant was a serious chronic drug abuser who was grossly intoxicated at the time of the murder. Moreover, the misleading "sting" of the prosecutor's tactic was diminished

---

[21]On redirect examination of Hortencia, counsel asked whether any court testimony she had given was limited to answering questions actually put to her by examining lawyers. She replied in the affirmative. Counsel then asked Hortencia whether he had represented defendant in the 1979 trials. She replied in the negative.

in several ways. Defense counsel's redirect examination of Hortencia (see fn. 21, *ante*, p. 927), though ambiguous, was calculated to advise the jury that Hortencia had never before been examined about defendant's drug-related behavior. When the prosecutor inquired of Irene whether she had mentioned the two PCP cigarettes in earlier testimony, she responded, "Nobody ever asked me." Defense counsel elaborated on the point in his redirect examination of Irene.

These exchanges gave the jury ample opportunity to conclude that the family's prior silence on drug issues did not mean the current testimony was fabricated. Hence, the prosecutor's unchallenged efforts to impeach the witnesses on this ground do not undermine confidence in the judgment.[22]

### 7. *Family violence; sufficiency of evidence.*

Defendant claims that evidence of his alleged 1969 assault on his sister-in-law Yolanda Estrada, and of alleged violence toward his parents in or before 1968, was inadmissible. In defendant's view, this evidence was legally insufficient to establish that such crimes were committed, and was also barred by the statute of limitations. However, the points are waived as direct appellate issues, since trial counsel made no effort to exclude or strike the evidence and submitted no request that the jury be instructed to disregard it.[23]

Nor can defendant prevail on his claims of ineffective assistance of counsel. We have previously rejected his assertion that evidence about an unadjudicated prior violent crime may not be presented in aggravation once

---

[22]Defendant makes a brief related contention that the prosecutor also committed misconduct, which his counsel should clearly have challenged, by impeaching Irene's "PCP cigarette" testimony with inconsistent hearsay statements made by defendant in his interview with Dr. Siegel. However, defendant's statements to Dr. Siegel were not made inadmissible by the hearsay rule. (See discussion, *ante*, p. 920.) In any event, we cannot assume that any mistake in the litigation of this highly collateral evidentiary matter was prejudicial.

[23]Even if defendant need do nothing at trial to preserve an appellate claim that evidence supporting his *conviction* is legally insufficient, a different rule is appropriate for evidence presented at the penalty phase of a capital trial. There the ultimate issue is the appropriate punishment for the capital crime, and evidence on that issue may *include* one or more other discrete criminal incidents. (§ 190.3, factors (b), (c).) If the accused thinks evidence on any such discrete crime is too insubstantial for jury consideration, he should be obliged in general terms to object, or to move to exclude or strike the evidence, on that ground. (Evid. Code, § 353, subd. (a); but cf. *People* v. *Belton* (1979) 23 Cal.3d 516, 521-523 [153 Cal.Rptr. 195, 591 P.2d 485] [motion for acquittal need not aid prosecution by identifying specific failure of proof].) And though the defendant is deemed to have objected to *instructions actually given* (§ 1259), generally he cannot claim that limiting instructions were wrongly *omitted* unless his proffer of such instructions was rejected. (See, e.g., *People* v. *Collie, supra*, 30 Cal.3d 43, 63-64; *People* v. *Woods* (1991) 226 Cal.App.3d 1037, 1054-1055 [277 Cal.Rptr. 269].)

the statute of limitations on the underlying offense has run. (E.g., *People* v. *Pinholster* (1992) 1 Cal.4th 865, 973 [4 Cal.Rptr.2d 765, 824 P.2d 571].) His claim of legal insufficiency has more merit, but he fails to demonstrate he was prejudiced by admission of the evidence.

As defendant observes, the only clear evidence about his violence against Yolanda and his parents was the statements given by Richard, Sr., Hortencia, and Rachel Montiel when deputies responded to the 1968 and 1969 family disputes. Each such extrajudicial claim of violence had apparently been made by only a single person.[24] At the 1986 trial, all these witnesses repudiated their earlier statements. On the stand, Rachel denied she saw defendant assault Yolanda, and her exculpatory trial version of the 1969 incident was corroborated by Helen Pacheco. Both of defendant's parents testified that he was never violent toward them.

 Generally, an extrajudicial statement repudiated at trial cannot form the sole basis for a conviction. (*In re Miguel L.* (1982) 32 Cal.3d 100, 106 [185 Cal.Rptr. 120, 649 P.2d 703]; *People* v. *Gould* (1960) 54 Cal.2d 621, 631 [7 Cal.Rptr. 273, 354 P.2d 865].) The concern is that "where 'no evidence' incriminates the accused save a single witness's extrajudicial statement repudiated under oath, the extrajudicial statement lacks the 'traditional indicia of reliability' which attach to an accusation made under oath and subject to cross-examination in a formal judicial proceeding. . . ." (*People* v. *Lucky, supra,* 45 Cal.3d 259, 289, quoting *Miguel L., supra,* at pp. 106-107.) We therefore assume, as defendant suggests, that an extrajudicial statement repudiated under oath is also legally insufficient, standing alone, to establish aggravating violent criminal conduct beyond a reasonable doubt (see *People* v. *Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279]) at the penalty phase of a capital trial.[25]

The People argue that the *Gould/Miguel L.* rule applies only when identification of the perpetrator is the crucial issue. While the rule developed in that context, however, its reach seems broader. The reliability concerns that prompted the rule apply equally when the issue is whether any crime occurred at all.

---

[24]Thus, Richard, Sr., alone told the deputies that defendant had beaten him in the past. Hortencia alone told the deputies that defendant tried to hit her with a telephone during the 1968 family argument; this was the only violence against her that came to light. Rachel alone told deputies in 1969 that defendant had struck Yolanda.

[25]We reiterate that *Gould* requires reversal only "when [the conviction] is based *solely* on an extrajudicial statement not confirmed by the witness at trial" (*In re Miguel L., supra,* 32 Cal.3d at p. 106, italics added), and the modicum of evidence which will validly support an unconfirmed extrajudicial statement is slight. For example, we have concluded that an unconfirmed extrajudicial statement by *one* witness may corroborate the unconfirmed extrajudicial statement of another, so as to remove the case from the *Gould/Miguel L.* rule. (*Lucky, supra,* 45 Cal.3d at p. 289.)

■ Even if counsel should have intervened, however, we find no reversible prejudice. These alleged incidents of family violence were by no means trivial, and the prosecutor did identify them as aggravating factors in his closing argument. However, they were both the least serious and the most weakly supported of the various aggravating matters presented for the jury's consideration. Given the brutal nature of the capital murder, and the several other incidents of violence and recidivism of which the jury was aware, counsel's failure to exclude evidence on these matters does not undermine confidence in the penalty judgment.[26]

### 8. *Hearsay regarding 1968 family argument.*

■ Deputy Fowler was one of two deputies who responded to the 1968 incident, in which defendant's brother Antonio was apparently stabbed. Fowler said Richard, Sr., told him at that time, among other things, that defendant had been berating Hortencia shortly before Antonio was cut. Defendant now suggests his counsel rendered ineffective assistance by failing to challenge this "inflammatory" and "irrelevant" hearsay.

The contention lacks merit. In earlier testimony, Richard, Sr., purported to recall details of the 1968 incident in a manner favorable to defendant. However, he consistently, and unconvincingly, denied remembering any unfavorable statements to responding deputies. Given the witness's evasiveness, Fowler's hearsay description of their 1968 conversation was admissible for its truth as a prior inconsistent statement. (Evid. Code, § 1235; *People* v. *Green* (1971) 3 Cal.3d 981, 985-991 [92 Cal.Rptr. 494, 479 P.2d 998].)

---

[26]Defendant makes several related arguments which may be rejected on similar grounds. First, he contends that under the applicable pre-Proposition 8 law (see *People* v. *Smith* (1983) 34 Cal.3d 251, 257-263 [193 Cal.Rptr. 692, 667 P.2d 149] [Prop. 8 does not affect trials for earlier crimes]), Rachel Montiel was improperly impeached with a prior conviction for sale of heroin. (See *People* v. *Spearman* (1979) 25 Cal.3d 107, 116, & fn. 5 [157 Cal.Rptr. 883, 599 P.2d 74].) Second, he urges the trial court erred by failing to instruct sua sponte that a fetus cannot be the victim of an assault. (Compare § 187 [*murder* is unlawful, malicious killing "of a human being, *or a fetus*" (italics added)] with § 240 [assault is committed "on the person of another"].) The prosecutor exploited the omission, he asserts, by exhorting the jury to consider defendant's attack on the pregnant Yolanda Estrada as a "double assault." However, the court satisfied its instructional duty by accurately setting forth the definition, elements, and defenses relating to assault. Defendant's other claims were waived by trial counsel's silence or express acquiescence. In any event, the obvious weakness and relative insignificance of the evidence of the Yolanda Estrada incident renders any arguable error harmless. (Compare *Johnson* v. *Mississippi* (1988) 486 U.S. 578 [100 L.Ed.2d 575, 108 S.Ct. 1981] [where subsequently invalidated *felony conviction* was aggravating factor on which prosecution principally relied, death judgment could not stand].)

Moreover, the evidence was clearly relevant, and more probative than prejudicial, to the dispute whether Antonio's injury was accidental or intentionally inflicted. The information aided the prosecution's theory that Antonio's attempt to protect Hortencia from defendant led to a fight in which defendant stabbed his brother. Hence, no basis for reversal appears.[27]

### 9. Question regarding defendant's preliminary hearing demeanor.

█ As a defense witness, Richard, Sr., testified that defendant's attitude in jail was subdued and sad. On cross-examination, the prosecutor asked whether the witness had observed the same demeanor while defendant was in court. When the witness said yes, the prosecutor asked whether he had seen defendant "sneering and jeering" at the preliminary hearing. Defense counsel's prompt objection was sustained.

Defendant complains that counsel's failure to request an admonition compromised his due process, fair trial, and reliable-penalty rights. However, we find the omission harmless. The colloquy between court and counsel on the objection, which occurred in the jury's presence, made clear the court's view that "it's [not] a proper question." A reasonable jury would clearly understand that it should disregard the question and not speculate about the answer. No basis for reversal appears.

### 10. Questions about sentencing credits.

Salvatore Russo, a prison teacher, testified for the defense that while on death row, defendant volunteered for educational help and made progress in reading, writing, and mathematics. On cross-examination, and without objection, the prosecutor asked Russo whether inmates can sometimes get "work time" or "good time" credits leading to an "early out" by participating in vocational and educational programs, and whether they may lose such benefits if they present disciplinary problems. Russo agreed.

█ Defendant urges that examination on these issues violated his California constitutional right of due process (Cal. Const., art. I, §§ 7, 15) because, like the so-called "Briggs Instruction" struck down in *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], it invited the

---

[27]Defendant contends his counsel was ineffective for conceding in jury argument that Antonio "almost died" from his wound. The evidence, defendant asserts, did not suggest the injury was life-threatening. However, there was testimony that Antonio had suffered a three- to four-inch-long chest wound and that an ambulance responded to the scene. Counsel's observations that Antonio "still cares" for defendant despite the seriousness of his injury was well within counsel's tactical discretion. (See *People* v. *Pope* (1979) 23 Cal.3d 412, 425-426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R. 4th 1].)

jury to speculate that a sentence of life without parole might someday be commuted, permitting his release. (See *id.*, pp. 155-159.)[28]

Defendant waived a direct appellate challenge to admission of this evidence by failing to object or move to strike in the trial court. Nor can defendant's claim of ineffective assistance succeed. The prosecutor's questions were probably improper under principles established in *Ramos*. But even if counsel should have intervened, the omission does not undermine confidence in the judgment.

As defendant concedes, the prosecutor's tactic was "subtle." On the other hand, the jury was expressly instructed that a death sentence would be carried out, and that if the jury sentenced defendant to life without parole, he "will not be released from prison." We have routinely held that such admonitions dispel *Ramos* prejudice. (E.g., *People* v. *Hamilton* (1988) 45 Cal.3d 351, 375 [247 Cal.Rptr. 31, 753 P.2d 1109]; *People* v. *Poggi, supra,* 45 Cal.3d 306, 336.) Defendant's suggestion that the instruction was not sufficiently prompt because it came only at the end of the case is not persuasive.[29]

11. *Cross-examination of defendant.*

Defendant asserts that the prosecutor committed several instances of misconduct related to defendant's own testimony. With one limited exception, defendant's counsel failed to object, thus waiving direct appellate challenges to that extent. Whether addressed directly or in the context of ineffective assistance, all of defendant's contentions must fail.

In his direct examination, defendant gave extensive testimony suggesting he had sought to rehabilitate himself on death row. On cross-examination, the prosecutor pursued a line of questioning designed to show that defendant's redemptive efforts might be motivated by his expectation of a new

---

[28]Defendant claims the problem was "compounded" by defense counsel's incompetent examination of two of his own witnesses. Counsel asked Norman Davis, a correctional officer, how defendant might be expected to do if sentenced to life without parole and placed in the general prison population. Davis responded that "if my character judgment is correct, he'd probably do twenty years in mainline." Defendant also complains that counsel did nothing when, as his final response on cross-examination, Dr. Nuernberger declared, "I'm not advocating parole. I'm simply trying to comprehend behavior." Contrary to defendant's suggestion, neither of these witnesses said anything remotely calculated to suggest defendant might be released from prison.

[29]Defendant urges prejudice because the jury received a written copy of the no-release instruction, on which the court had inked over the word "never" and substituted "not." In defendant's view, the jury would speculate why the less forceful word had been inserted. So far as the photocopy included in the clerk's transcript discloses, the word stricken from the instruction was completely blotted out, and there was no basis for jury speculation about what that word might have been.

penalty trial. Defendant's prompt objection was initially sustained, but the prosecutor argued that his questions went to defendant's "state of mind" and then proceeded without further hindrance.

Responding to the prosecutor's questions, defendant denied that appellate reversals were "one of the biggest topics of conversation" on death row, but he agreed with the prosecutor's suggestion that getting a new trial was "a big factor on your mind during this period of time." In his closing argument, the prosecutor argued without objection that new trials must be "topic number one" for condemned prisoners, and that defendant had "six years to prepare, . . . to come back, to have another shot at it."

 Defendant now claims this prosecutorial conduct improperly diminished the jury's sense of sentencing responsibility by calling attention to the fact that its penalty judgment was subject to reversal on appeal. (Citing *Caldwell* v. *Mississippi, supra,* 472 U.S. 320, 328-329 [86 L.Ed.2d 231, 238-240]; *People* v. *Linden* (1959) 52 Cal.2d 1, 26-27 [338 P.2d 397].) We find no impropriety. Once defendant introduced mitigating evidence of his rehabilitative efforts in prison, the People were entitled to attack his sincerity by exposing the obvious hope of gaining jury sympathy in a later sentencing trial.

Defendant suggests that evidence of a "new trial" motive is more prejudicial than probative as a matter of law. (Evid. Code, § 352.) He also asserts that injection of such issues will chill capital defendants' federal constitutional right to introduce mitigating character and background evidence. (Citing *Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669].) Neither contention is persuasive. Nothing in Evidence Code section 352, or in *Skipper, supra,* supports the notion that defendant may present evidence of his rehabilitation in a false light.

 Defendant next contends the prosecutor overstepped by forcing defendant to admit that "[a]ll your needs," such as food, art supplies, books, and a television, "were provided . . . in prison" so "[y]ou didn't have to work for money . . . ." The prosecutor elaborated on this theme in closing argument by suggesting that in prison, defendant had no need to rob because his needs were met.

Defendant suggests the prosecutor thus penalized the exercise of his rights under *Skipper, supra,* by bringing "aggravating evidence" before the jury which was both statutorily and constitutionally irrelevant. However, counsel's failure to object waives any direct challenge, and defendant's claim of ineffective assistance also fails. The prosecutor was entitled to rebut defendant's mitigating evidence of good prison behavior by placing it in proper

perspective. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 791 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Boyd, supra,* 38 Cal.3d 762, 775-776.)

Finally, defendant testified on direct examination that he had accepted Christianity in prison, read the Bible, had come to feel remorse for the murder victim and his family, and would sacrifice his own life if that would bring the victim back. The prosecutor challenged these claims by obtaining, then stressing to the jury, defendant's concession that he did not literally agree with the Biblical maxim "an eye for an eye, a tooth for a tooth."

■■■ Defendant asserts that the prosecutor thus penalized his freedom of religious belief as guaranteed by the state and federal Constitutions (U.S. Const., Amend. I; Cal. Const., art. I, § 4). The claim, waived by failure to object, lacks merit in any event. No constitutional principle precludes examination of a witness about the sincerity and depth of religious and remorseful feelings he himself has placed in issue. (Cf., *People* v. *Danielson* (1992) 3 Cal.4th 691, 715 [13 Cal.Rptr.2d 1, 838 P.2d 729].) Nor was reference to the Biblical maxim in this context calculated to diminish the jury's sense of sentencing responsibility.

12. *Victim impact.*

Under direct questioning by the prosecutor, the murder victim's grandson David testified that his grandfather, though 78 years old at the time of his death, was in excellent health, needed a walker to get around, but could hold a normal conversation, and was capable of "enjoy[ing] life to the fullest." In closing argument, the prosecutor asked the jury to remember the emotion in David's testimony and urged that the victim's wife, siblings, children, and grandchildren had been robbed of a beloved relative. He concluded this portion of his argument by "implor[ing]" the jury to return the death penalty, not only for the victim, his "children and his family," but also for the People of the State of California.

■■■ Counsel's failure to object and/or request an admonition waives any direct appellate challenge to this evidence and argument. The contention must also fail in the context of ineffective assistance of counsel.

Defendant concedes that earlier cases finding a federal constitutional proscription against "victim impact" evidence and argument (see *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207]; *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529]) have been overruled. (*Payne* v. *Tennessee* (1991) __ U.S. __ [115 L.Ed.2d

720, 111 S.Ct. 2597]). Moreover, after *Payne* was decided, we concluded that the immediate injurious impact of a capital murder is a "circumstance of the crime" (§ 190.3, factor (a)) which may be introduced and argued in aggravation under state law. (*People* v. *Edwards* (1991) 54 Cal.3d 787, 833-836 [1 Cal.Rptr.2d 696, 819 P.2d 436].) By raising issues such as the victim's zest for life and the effect of his death on his immediate family, the prosecutor acted well within the boundaries of our *Edwards* decision. (*Id.*, at p. 826.)

Defendant asserts the prosecutor improperly argued that the victim's family favored the death penalty. However, a reasonable jury would interpret the prosecutor's plea for death "for" the victim's "children and family" as merely a claim that the supreme penalty was the only appropriate means of redressing the injury. No basis for reversal appears.

13. *Custodial history.*

Defendant complains that his due process, confrontation, and reliable-penalty rights were violated by improper evidence and argument about his history of incarceration. First, he asserts that without evidentiary support, the prosecutor improperly suggested he had not been violent between 1973 (the Ramirez burglary) and 1979 (the Mankin robbery and Ante murder) because he was "continuously" incarcerated during that period. Second, he complains his own counsel was incompetent for eliciting from Hortencia the irrelevant fact that he was in jail one month before the murder.

Counsel did nothing in response to the prosecutor's argument, and defendant fails to persuade that an admonition would not have cured any harm. Hence, any direct appellate challenge to the prosecutor's remark is barred. In any event, we see no impropriety.

After discussing the 1973 Ramirez burglary, the prosecutor said, "We move on. January 13th, 1979. And . . . obviously there's *some time* where the defendant is not available to victimize, to rob, to prey on people." (Italics added.) From defendant's 1973 burglary conviction, it was reasonable to infer he had spent "some time" in custody, and the prosecutor did not suggest his incarceration had been "continuous." Reasonably understood, his comment merely placed the aggravating evidence in perspective by inviting the jury to assume that for *some* period after the 1973 burglary conviction, defendant had no opportunity to commit criminal acts on the street. Such argument was not precluded.

Finally, we see no prejudice in Hortencia's brief statement about defendant's most recent prior incarceration. The valid evidence painted defendant

as a chronic drug abuser who was periodically in trouble with the law. Any further improper aggravating inference the jury might draw from Hortencia's disclosure was marginal at worst. No basis for reversal appears.

### 14. *Misdemeanor burglary conviction.*

After eliciting eyewitness testimony from Anthony Ramirez, the victim of the 1973 burglary, the prosecution offered a court record showing defendant's plea of guilty to a misdemeanor in connection with the offense. The prosecutor offered the document only to corroborate defendant's identity as the perpetrator, and he noted that "[i]t is proper to have a limited instruction if the defense wants it." Defense counsel made no such request, and the record of defendant's conviction was received in evidence.

Defendant cites his counsel as ineffective for failing to seek the suggested instruction. He also claims the trial court erred by failing to give such an instruction sua sponte. No sua sponte duty existed, and counsel's failure to act does not warrant reversal.

*Conviction* of an offense is permissible aggravating evidence only if the conviction is for a felony. (§ 190.3, factor (c).) However, because the 1973 burglary involved actual or threatened violence, its circumstances were independently admissible in aggravation under factor (b) of section 190.3. The danger that the jury would assign significant additional aggravating weight to the fact of conviction was minimal. (*People* v. *Webster* (1991) 54 Cal.3d 411, 454 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Morales* (1989) 48 Cal.3d 527, 557 [257 Cal.Rptr. 64, 770 P.2d 244].) Hence, counsel's omission does not undermine confidence in the judgment.

### 15. *Davenport error.*

As defendant correctly observes, the prosecutor committed misconduct by expressly arguing, subsequent to our decision in *People* v. *Davenport* (1985) 41 Cal.3d 247, 290 [221 Cal.Rptr. 794, 710 P.2d 861], that the capital murder was aggravated by the absence of statutory sentencing factors (see § 190.3) which can only be mitigating. The prosecutor made such claims as to factors (e) (victim consent or participation) and (g) (extreme duress or substantial domination by another).[30]

---

[30]Defendant claims similar misconduct with respect to factors (d) (extreme mental or emotional disturbance) and (f) (reasonable belief in moral justification), but in those cases,

*Davenport*, decided in December 1985, clearly stated that prosecutorial argument of this kind "should not in the future be permitted." (41 Cal.3d at p. 290.) We cannot condone the direct violation of *Davenport* committed by the prosecutor in this 1986 trial.

 ▬ ██ However, though counsel posed an unmeritorious and unsuccessful "relevancy" objection to argument about factors (e), (f), and (j),[31] he did not challenge the prosecutor's improper attempt to convert "absence of mitigation" into "aggravation." Hence, a direct claim of *Davenport* error is barred.

In any event, we have consistently deemed such misargument harmless under similar circumstances, and we do so here. The jury was instructed to consider only those sentencing factors it deemed "applicable." It heard that the sentencing process involved subjective weighing, not mechanical counting, of factors; that it was free to assign "whatever moral or sympathetic value you deem appropriate to each and all" of the factors; and that its task was "simply [to] determine under the relative evidence which penalty is justified and appropriate" by considering the totality of aggravation and mitigation. Finally, it was admonished that the death penalty could be assessed only if each juror was persuaded "that the aggravating evidence is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

Despite the prosecutor's argument, a reasonable jury thus aware of the facts, and of its broad sentencing discretion, " 'would not assign substantial aggravating weight to the absence of unusual extenuating factors.' " (*People v. Clark, supra*, 3 Cal.4th 41, 169, quoting *People v. Gonzalez, supra*, 51

---

the prosecutor simply noted the absence of mitigating evidence; he did not label the absence of these factors as aggravating. The prosecutor did label aggravating the fact that defendant was not a mere accomplice with relatively minor participation (factor (j)), but we have not resolved whether evidence on this issue can only be mitigating. (*People v. Proctor* (1992) 4 Cal.4th 499, 553 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

[31] We have consistently held that a capital defendant is not entitled to delete all instructional or argumentative reference to statutory mitigating factors as to which no evidence was presented. (E.g., *People v. Danielson, supra*, 3 Cal.4th 691, 718; *People v. Whitt* (1990) 51 Cal.3d 620, 653 [274 Cal.Rptr. 252, 798 P.2d 849]; *People v. Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].) "[A]s is apparent from the statutory language, it is for the jury to determine which of the listed factors are applicable or 'relevant' to the particular case. (§ 190.3, par. 6.) . . . ." (*Miranda, supra*, at p. 105.) We therefore reject defendant's separate arguments that his objection should have been sustained, and that the trial court erred by failing, sua sponte, to delete the "inapplicable" mitigating factors from its instructions.

Cal.3d 1179, 1234; see also *People* v. *Proctor, supra*, 4 Cal.4th 499, 544-545; *People* v. *Brown, supra*, 46 Cal.3d 432, 454-456.) There is no reasonable likelihood the jury was misled to defendant's prejudice. Thus, no basis for reversal appears.[32]

### 16. *Dual use of aggravating evidence.*

Among other things, section 190.3 requires the penalty jury to consider "[t]he circumstances of the crime for which the defendant was convicted in the present proceeding" (factor (a)), "[t]he presence or absence of [violent] criminal activity by the defendant" (factor (b)), and "[t]he presence or absence of any prior felony conviction" (factor (c)). ▮▮ Though the statute is not express on the point, we have observed that factor (a) obviously pertains to crimes of which defendant was convicted in the capital proceeding, while factors (b) and (c) pertain only to other crimes by the defendant. (E.g., *People* v. *Ashmus* (1991) 54 Cal.3d 932, 998 [2 Cal.Rptr.2d 112, 820 P.2d 214]; *People* v. *Miranda, supra*, 44 Cal.3d 57, 106.)

▮▮ The instant jury was instructed without elaboration in the statutory language. (CALJIC No. 8.84.1.) Defendant claims the trial court erred prejudicially by failing to clarify, sua sponte, the proper separation among factors (a), (b), and (c), thus permitting duplicative multiple consideration of the same aggravating evidence under all these factors.

In *People* v. *Miranda, supra*, which was decided after this trial, we directed that clarifying instructions be given in future cases "to avoid any possible confusion." (44 Cal.3d at p. 106, fn. 28.) However, we have consistently found that the absence of a clarifying instruction on this issue is harmless.

As we have explained, factors (a), (b), and (c), taken together, allow the jury to consider all the offenses of which defendant was convicted in the current proceeding,[33] all his other criminal violence, and all his felony convictions entered before the capital crime was committed. Yet nothing in

---

[32]Contrary to defendant's separate suggestion, the trial court had no sua sponte duty to instruct that the absence of a mitigating factor is not itself aggravating. (*People* v. *Livaditis* (1992) 2 Cal.4th 759, 784-785 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

[33]Defendant makes the insupportable argument that neither factor (a) nor factor (b) permits aggravating consideration of crimes which, though unrelated to the capital murder, were charged and tried in the same proceeding. Hence, he urges, the jury was obliged to disregard the Mankin robbery in determining the penalty. However, we have assumed that factor (a), though it speaks in the singular of the "crime" of which defendant was currently convicted, covers the "circumstances" of *all* offenses, singular or plural, that were adjudicated in the capital proceeding. (E.g., *Ashmus, supra*, 54 Cal.3d at p. 998; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1063 [251 Cal.Rptr. 757, 761 P.2d 680].) No other construction is remotely reasonable.

the statute or parallel instructions implies that any of these matters may be considered more than once. Hence, even if one or more jurors mistakenly consider a particular criminal incident under the wrong factor, there is little risk that a reasonable jury will give a single incident duplicative consideration. (*Ashmus, supra*, 54 Cal.3d at p. 998.)[34]

Defendant claims the prosecutor's argument encouraged dual use, but we see no such implication. The prosecutor thoroughly covered all relevant aspects of defendant's criminal record. He properly urged that the current crimes, including the Mankin robbery, were the culmination of a violent history. Though he displayed occasional uncertainty about which factor or factors applied to particular evidence, he never urged the jurors to consider the same aggravating aspect of defendant's behavior or history more than once.[35]

Defendant emphasizes that on several occasions, the prosecutor invited the jurors to count, rather than weigh, the aggravating factors.[36] This, he urges, exacerbated the danger of improper dual use of aggravating evidence.

---

To exclude from consideration this entire highly relevant class of criminal conduct would be anomalous.

[34]Defendant concedes we have held that when the defendant suffered a "prior" felony conviction for a violent crime, such as defendant's 1972 Foster Freeze robbery, the jury *may* separately consider the violence under factor (b) and the conviction under factor (c). (*People v. Melton, supra*, 44 Cal.3d at pp. 764-765.) Defendant urges us to overrule this holding, but he presents no persuasive reason to do so.

Defendant also fears the jurors may have thought they could give independent consideration to defendant's *conviction* for the Mankin robbery, although factor (a) permits no separate consideration of *convictions in the current proceeding*, and factor (c) permits aggravating use of other felony convictions only if the convictions themselves preceded the capital crime. (*People v. Balderas* (1985) 41 Cal.3d 144, 203 [222 Cal.Rptr. 184, 711 P.2d 480].) However, the express language of factor (c) includes the word "prior," thus strongly implying its limitation to earlier convictions. In any event, having heard compelling evidence of the *facts* of the Mankin robbery, the jury was unlikely to give substantial independent aggravating weight to the subsequent conviction. (See *ante*, p. 936.)

[35]Defendant worries in particular that the prosecutor encouraged improper separate consideration of his *conviction* for the January 13, 1979 robbery of *Eva Mankin* when, after discussing the 1972 Foster Freeze robbery and its resulting conviction, the prosecutor said, "We move on. *January 13, 1979. And again, we have got the felony conviction for the robbery*, and obviously there's some time when the defendant is not available to victimize, to rob, to prey on people." (Italics added.) The contention lacks merit. In context, the prosecutor was clearly referring to the *1972* conviction, followed by a period in which defendant was not "available," followed by the Mankin *incident*.

[36]During his initial closing argument, the prosecutor, who was working from a chart showing his version of the aggravating and mitigating factors, exhorted the jury to "[l]ook at these circumstances, ladies and gentlemen. Look at each one. Count them up. Add them any way you look at it. All together they point toward the death penalty." At another point, the prosecutor said, "I've got . . . 11 factors here, ladies and gentlemen. [¶] Now, as I indicated earlier, this is just not a numerical situation [, though] [o]f course, . . . 10 of these 11 [point] to the death penalty, that's only numerically." Again in rebuttal, the prosecutor remarked that

However, the court carefully instructed the jury that it must undertake subjective "weighing," rather than "mechanical counting," in order to reach the "appropriate" penalty. The bulk of both counsels' arguments focused on this issue. We have routinely disapproved "counting" references, and we do so here. However, there is no reasonable likelihood this jury was misled.

17. *Definitions of aggravation and mitigation.*

On the second day of deliberations, the jury made a written request for definitions of aggravating and mitigating circumstances, "in writing if possible." Without apparent objection from defense counsel, the court delivered, then substantially repeated, the following response, proceeding slowly so the jurors could take notes: "Now, one is the opposite of the other . . . . [¶] Aggravation. The act, action or result of aggravation or of aggravating. An increasing in seriousness or severity, an act or a circumstance that intensifies or makes worse. [¶] Mitigation. The act of mitigating. To cause to become more gentle or less severe or less hostile, to soften, to alleviate."

 Defendant claims this instruction encouraged the jury to ignore mitigating character and background evidence (see, e.g., *Skipper* v. *South Carolina, supra,* 476 U.S. 1, 4 [90 L.Ed.2d 1, 6-7]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954]) because it implied that mitigation relates only to the circumstances of the capital crime itself. We have previously dismissed similar challenges to essentially identical instructions. (*People* v. *Lang* (1989) 49 Cal.3d 991, 1035-1037 [264 Cal.Rptr. 386, 782 P.2d 627]; see also *People* v. *Karis* (1988) 46 Cal.3d 612, 645 [250 Cal.Rptr. 659, 758 P.2d 1189].)

Here, as in *Lang, supra,* the jury was expressly instructed to consider not only extenuating aspects of the capital offense, but also "any sympathetic or other aspect of the defendant's character or record that the defendant offered as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." Moreover, the jury was told it could assign whatever "sympathetic value" it deemed appropriate to each relevant factor. While prosecution and defense disagreed on the weight of defendant's mitigating character and background evidence, both counsel conceded its legal relevance in their arguments. As in *Lang,* we see no reasonable likelihood the jury was misled.[37]

---

"[w]hen you look at all these factors . . . , they show not only in weight, [but] by numbers, each and every one, they point to the death penalty."

[37]Defendant urges us to reconsider the rationale of *Lang.* There appears no persuasive reason to do so.

18. *Single-witness instruction.*

CALJIC No. 2.27 (1977 Rev.) reads as follows: "Testimony which you believe given by one witness is sufficient for the proof of any fact. However, before finding any fact required to be established by the prosecution to be proved solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of such fact depends." The trial court gave this instruction as modified to delete the phrase "required to be established by the prosecution."

■ Defendant contends the modified instruction undermined the prosecution's duty to prove aggravating criminal violence (§ 190.3, factor (b)) beyond a reasonable doubt (see *People* v. *Robertson, supra,* 33 Cal.3d 21, 53-55) by implying that if the *defense* called witnesses to rebut prosecution evidence on these issues, it too must shoulder a burden of "prov[ing] . . . facts," and any such "proof" by a single defense witness was suspect. The contention lacks merit.

In *People* v. *Turner* (1990) 50 Cal.3d 668 [268 Cal.Rptr. 706, 789 P.2d 887], we rejected an identical challenge to the guilt judgment in a capital case. We acknowledged some ambiguity in the modified instruction's undifferentiated reference to "proof" of "facts," but we made clear that application of the single-witness instruction against the prosecution alone would accord the testimony of defense witnesses an unwarranted aura of veracity. (*Id.,* at pp. 695-697.)

Nor is there a reasonable likelihood the jury was misled about the prosecution's burden of proof. Here, as in *Turner, supra,* the jury received extensive instructions which made clear that the prosecution had the burden of proving every element of any criminal offense beyond a reasonable doubt. Here, as there, "[w]e cannot imagine that the generalized reference to 'proof' of 'facts' in CALJIC No. 2.27 would be construed by a reasonable jury to undermine these much-stressed principles." (*Turner, supra,* 50 Cal.3d at p. 697.)

19. *Failure to instruct on intoxication.*

■ The trial court instructed on the elements of all crimes which the jury might consider in aggravation. However, it failed to advise, with respect to the Mankin robbery, that defendant's intoxication could be considered in deciding whether he formed the specific intent to commit that crime. Defendant asserts he was prejudiced by the court's failure to give such an instruction sua sponte.

In a guilt trial, the court must instruct sua sponte on legally available defenses, such as intoxication which may negate specific intent, when such defenses are supported by substantial evidence. (E.g., *People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913].) Though there is no sua sponte duty at the penalty phase to instruct on the elements of "other crimes" introduced in aggravation (e.g., *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1075 [5 Cal.Rptr.2d 230, 824 P.2d 1277]), when such instructions are given, they should be accurate and complete. (See *People* v. *Malone* (1988) 47 Cal.3d 1, 49 [252 Cal.Rptr. 525, 762 P.2d 1249].) We therefore assume, without deciding, that penalty instructions on the elements of aggravating "other crimes" should include, on the court's own motion if necessary, any justified intoxication instructions.

Nonetheless, no reversible error occurred with respect to the Mankin robbery. Any right to correct instructions on crimes introduced in aggravation at the penalty phase stems from the right to have the penalty jury consider such crimes only if it finds them true beyond a reasonable doubt. (See *People* v. *Robertson, supra,* 33 Cal.3d 21, 53-55.) However, decisions establishing the reasonable doubt standard for penalty phase criminal evidence make clear that they are referring to crimes *introduced for the first time at the penalty trial*—i.e., crimes "other" than, or "prior" to, those just established beyond reasonable doubt at the guilt phase of the same case. (See, e.g., *Robertson, supra,* 33 Cal.3d at pp. 53-55; *People* v. *Stanworth* (1969) 71 Cal.2d 820, 840 [80 Cal.Rptr. 49, 457 P.2d 889]; *People* v. *McClellan* (1969) 71 Cal.2d 793, 804-806 [80 Cal.Rptr. 31, 457 P.2d 871]; *People* v. *Polk* (1965) 63 Cal.2d 443, 450-451 [47 Cal.Rptr. 1, 406 P.2d 641]; *People* v. *Terry, supra,* 61 Cal.2d 137, 149, fn. 8.)

Nothing in these authorities implies that crimes actually charged, proven, and finally adjudicated in the guilt trial—such as the robbery of Eva Mankin in this case—must be re-proven at the penalty phase before the jury can consider them in aggravation under factor (a). We decline to expand the *Robertson* rule in such a fashion.

The instant trial court, acting out of an abundance of caution, instructed that such "re-proof" was necessary as to the Mankin robbery; in so doing, however, it provided defendant with a benefit to which he was not entitled. It follows that any omission of instructions that intoxication might provide a

defense to that crime did not prejudice the defendant's substantial rights. No basis for reversal appears.[38]

20. *1978 law sentencing scheme.*

Defendant argues that the sentencing scheme under California's 1978 death penalty law is constitutionally flawed in numerous ways. We have routinely rejected identical claims.

Thus, neither the 1978 law nor the instructions given in this case are defective for failing to make express distinctions between aggravating and mitigating circumstances. (See *People* v. *Cox* (1991) 53 Cal.3d 618, 674-675 [280 Cal.Rptr. 692, 809 P.2d 351].) There is no constitutional requirement of findings, let alone unanimous or written findings, that every aggravating factor weighed by the jury was true beyond a reasonable doubt, that specific aggravating factors were dispositive, that aggravation outweighed mitigation beyond a reasonable doubt, or that death is the appropriate penalty beyond a reasonable doubt. (*Id.*, at p. 692, and cases there cited.) It is permissible to allow consideration of age-related circumstances as sentencing factors (*People* v. *Lucky, supra,* 45 Cal.3d 259, 301-302), introduce unadjudicated prior crimes at the penalty trial (*People* v. *Balderas, supra,* 41 Cal.3d 144, 204-205), and present the circumstances of prior violent criminal incidents which resulted in guilty pleas (*People* v. *Melton, supra,* 44 Cal.3d 713, 755-756). A jury told it may sympathetically consider all mitigating evidence need not also be expressly instructed that it may exercise "mercy." (*People* v. *Caro, supra,* 46 Cal.3d 1035, 1067, cert. den. (1989) 490 U.S. 1040 [104 L.Ed.2d 414, 109 S.Ct. 1944].) The same underlying felony may be used to establish first degree murder, death eligibility, and aggravation warranting the death penalty. (*Lowenfield* v. *Phelps* (1988) 484 U.S. 231, 241-246 [98 L.Ed.2d 568, 579-583, 108 S.Ct. 546]; *People* v. *Marshall* (1990) 50 Cal.3d 907, 945-946 [269 Cal.Rptr. 269, 790 P.2d 676].) The 1978 death penalty law does not deny equal protection insofar as it deprives capital defendants of the benefits of the Determinate Sentencing Act. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1330 [248 Cal.Rptr. 834, 756 P.2d 221]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1286-1288 [232 Cal.Rptr. 849, 729 P.2d 115].)

21. *Cumulative prejudice.*

■ Defendant urges that in combination, the various errors and lapses of counsel caused "cumulative" prejudice warranting reversal of the death

---

[38]We are not persuaded that omission of an intoxication instruction unduly interfered with defendant's right to have the penalty jury consider in mitigation any "lingering doubt" about his guilt of the Mankin robbery.

judgment. After a careful review of the record, we disagree. The trial errors acknowledged in this opinion were relatively few in number. Though they were not trivial, their significance to the actual fairness of defendant's trial was minimal. "Neither singly nor together could they have affected the process or the result to defendant's detriment." (*People* v. *Ashmus, supra,* 54 Cal.3d at p. 1006; also cf., *United States* v. *Cronic* (1984) 466 U.S. 648, 656-657 [80 L.Ed.2d 657, 666-667, 104 S.Ct. 2039].)

22. *Stringer v. Black.*

 In his reply brief, defendant argues that the sentencing factors contained in section 190.3 are impermissibly vague under *Stringer* v. *Black* (1992) 503 U.S. __ [117 L.Ed.2d 367, 112 S.Ct. 1130]. We have held that, assuming our statute is subject to the rationale of *Stringer,* factors (a) (circumstances of crimes adjudicated in capital guilt proceeding), (b) (other violent criminal activity), and (i) (defendant's age at time of capital crime) withstand vagueness challenges. Each of these factors "[directs] the sentencer's attention to specific, provable, and commonly understandable facts about the defendant and the capital crime that might bear on his moral culpability. . . ." (*People* v. *Tuilaepa, supra,* 4 Cal.4th 569, 595; see also *People* v. *Noguera* (1992) 4 Cal.4th 599, 648-649 [15 Cal.Rptr.2d 400, 842 P.2d 1160]; *People* v. *Proctor, supra,* 4 Cal.4th 499, 550-551.) Similar considerations apply to factor (c) (prior felony convictions), and to factors (d) through (k), which further channel the sentencer's discretion by identifying additional "specific, provable, and commonly understandable facts" about the capital offense and offender which the state properly deems pertinent to the penalty determination.[39]

Defendant urges that section 190.3 violates *Stringer* because it does not expressly identify which sentencing factors are aggravating and which are mitigating. We disagree. We have noted that certain of the factors can only be mitigating (e.g., factors (d), (e), (f), (g), (h), and (k)), and we have further concluded that the mitigating nature of these factors is clear even in the face of contrary argument. (See discussion, *ante,* pp. 937-938.) The aggravating nature of certain others (e.g., factors (b) ["other" violent criminal activity], (c) [prior felony convictions]) is equally apparent. Still other factors may

---

[39]These factors direct the sentencer to consider whether the defendant committed the capital offense under extreme mental or emotional disturbance (factor (d)), with victim participation or consent (factor (e)), with reasonable belief in moral justification (factor (f)), under extreme duress or substantial domination by another (factor (g)), while impaired by mental disease or defect, or intoxication (factor (h)), or as an accomplice with relatively minor participation (factor (j)). They also instruct the sentencer to consider any extenuating circumstance of the capital crime, and any other mitigating character and background evidence the defendant offers as the basis for a sentence less than death (factor (k)).

allow either aggravating or mitigating consideration, depending on the particular circumstances. However, so long as they focus the sentencer's consideration on "specific, provable, and commonly understandable facts" that properly bear on the appropriate penalty, they cannot be deemed unconstitutionally vague "simply because they leave the sentencer free to evaluate the evidence in accordance with his or her own subjective values." (*People* v. *Tuilaepa, supra*, 4 Cal.4th 569, 595.) Defendant's challenge must be rejected.

23. *Section 190.4(e) motion.*

Defendant complains that the trial court committed several varieties of prejudicial error in ruling on his automatic motion for modification of the death verdict (§ 190.4(e)). His contentions lack merit.

■ Defendant first points to the court's observations that defendant brutally murdered a "helpless" and "defenseless" old man "for financial gain," and that the killing occurred "in the commission of a robbery" which was established by overwhelming, uncontroverted evidence. Thus, defendant asserts, the court perpetuated the erroneous consideration of the duplicative financial-gain finding we had stricken in *Montiel I.*

However, the record suggests the court was using "financial gain" not as a term of art, but as a synonym for robbery. There is no indication the court artificially inflated the seriousness of the capital crime by counting the financial-gain and robbery-murder findings separately.

Defendant next urges the trial court committed *Davenport* error by deeming the absence of certain mitigating factors to be aggravating. (See discussion, *ante*, p. 936.) Nothing on the face of the court's remarks supports the claim. (See *People* v. *Lang, supra*, 49 Cal.3d 991, 1044.) Defendant notes only that the court had just denied his new trial motion raising *Davenport* issues, but the inference defendant thus seeks to draw is unpersuasive.

■ Defendant contends the trial court improperly considered the legally insufficient evidence of the alleged 1969 assault on Yolanda Estrada. (See discussion, *ante*, pp. 928-930.) However, though the prosecutor argued this incident in aggravation, the court's comments do not suggest it gave the assault on Yolanda any significant weight.[40]

---

[40]The court observed generally that "[t]he evidence established beyond reasonable doubt that the defendant had in the past used, or attempted to use, force and violence upon others and threatened force and violence upon other persons." This remark is supported by the valid

██ Defendant next argues the court did not give a sufficient statement of reasons for its ruling (see *People* v. *Rodriguez, supra*, 42 Cal.3d 730, 792-794) because it did not separately discuss whether each of the statutory aggravating and mitigating factors was present or absent. The claim is not convincing.

The court indicated awareness that it must independently weigh the penalty evidence. It noted as aggravating factors the circumstances of the Mankin robbery, the Ante robbery-murder, and defendant's violent past. Discussing the capital murder in detail, the court noted the brutal method of killing and the vulnerability of the victim. The court cited defendant's prison behavior, and his allegedly impaired mental capacity during the homicide, as possible mitigating factors. However, it deemed defendant's mental defense to be outweighed by expert and circumstantial evidence suggesting that his intoxication did not render him unable to appreciate the criminality of his conduct. In particular, the court focussed on evidence of his immediate concern for incriminating items left at the scene of the murder. The court also found generally that the mitigating evidence was outweighed by the evidence in aggravation.

Deeming defendant a "brutal" killer who "is a serious menace to civilized society," the court made clear that, based on the evidence presented at the trial, "I would have reached the same conclusion as the jury." This statement of reasons was adequate. (See *People* v. *Anderson* (1990) 52 Cal.3d 453, 484 [276 Cal.Rptr. 356, 801 P.2d 1107]; *People* v. *Hernandez* (1988) 47 Cal.3d 315, 371-373 [253 Cal.Rptr. 199, 763 P.2d 1289].)

██ Finally, defendant claims we must assume the court weighed certain improper considerations urged by the prosecutor, i.e., that "35 of . . . 36 [jurors had] . . . found death the proper penalty,"[41] that the murder victim's family had "prayed" for a death sentence, and that defendant was "dangerous." Of course, evidence-based arguments about the defendant's potential for future violence are not prohibited. (E.g., *People* v. *Payton* (1992) 3 Cal.4th 1050, 1063-1064 [13 Cal.Rptr.2d 526, 839 P.2d 1035]; *People* v. *Bell* (1989) 49 Cal.3d 502, 549 [262 Cal.Rptr. 1, 778 P.2d 129].) Even if the other two comments were improper, there is no indication the court weighed them in reaching its decision. (See *People* v. *Lang, supra*, 49 Cal.3d 991, 1044.) We see no error affecting the motion for modification of verdict.

---

evidence, which includes such more significant incidents as the 1972 Foster Freeze robbery, the 1973 Ramirez burglary, and the 1968 knife assault against defendant's brother.

[41]The remark referred to the 1979 "hung" penalty jury, the subsequent 1979 death verdict overturned in *Montiel I*, and the current penalty verdict.

## DISPOSITION

The judgment of death is affirmed.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., and George, J., concurred.

**MOSK, J.**—I dissent.

On retrial of the issue of penalty after we reversed a judgment of death in *People* v. *Montiel* (1985) 39 Cal.3d 910 [218 Cal.Rptr. 572, 705 P.2d 1248] (hereafter *Montiel I*), the question whether defendant's life was to be taken or spared turned largely on the extent of his use of drugs and alcohol around the time of the offenses in question and on the degree of his resulting mental impairment. It was undisputed, as even the prosecutor's expert witness had to admit, that defendant was then "obviously grossly intoxicated."

In my view, defense counsel provided defendant with ineffective assistance in violation of his rights under the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution.

To begin with, the trial was tainted by pervasive and serious deficiencies on the part of defense counsel related to pervasive and serious misconduct on the part of the prosecutor.

For example, the prosecutor improperly rested his case for death in part on the financial-gain special circumstance found by the jury at the original trial—which he urged weighed against any impairment on defendant's part —in spite of the fact that he knew that in *Montiel I* (39 Cal.3d, *supra*, at pp. 927-928) we had set that finding aside. The majority concede, as they must, that what they understate as the prosecutor's "mistake" is "serious and deeply troubling." (Maj. opn., *ante*, at p. 926.) Defense counsel, however, failed to object.

The prosecutor proceeded to wrongfully press his case for death by suggesting that life imprisonment without possibility of parole did not mean life imprisonment *without possibility of parole*, in spite of the fact he knew that in *Montiel I* (39 Cal.3d, *supra*, at p. 928) we had reversed as to penalty because the trial court had given the so-called "Briggs Instruction," which carried such a suggestion. Defense counsel, however, failed to object.

In addition, the prosecutor inexcusably used as substantive evidence Michael Palacio's inadmissible hearsay relating defendant's alleged confession, which he presented as weighing against impairment. The majority

concede, as they must, that the "confession" is the "only direct evidence that defendant consciously formed a criminal intent before he killed . . . ." (Maj. opn., *ante*, at p. 921.) Defense counsel, however, failed to object.

Similarly, the prosecutor inexcusably used as substantive evidence inadmissible hearsay by a defense expert witness at the original trial, which he presented as weighing against impairment. Defense counsel, however, failed to object.

Also, the prosecutor falsely insinuated that defendant's father, mother, and sister recently fabricated their testimony about defendant's extensive use of drugs and alcohol around the time of the offenses in question and his resulting substantial mental impairment. Defense counsel, however, failed to object.

Moreover, the prosecutor improperly impeached defendant's former wife with a felony sale-of-heroin conviction, even though he must have known that under *People* v. *Spearman* (1979) 25 Cal.3d 107, 116, footnote 5 [157 Cal.Rptr. 883, 599 P.2d 74], which declared the governing, pre-Proposition 8 law, a witness could not be impeached with such a conviction. Defense counsel, however, failed to object.

In addition, the prosecutor wrongfully argued that the absence of mitigation amounted to the presence of aggravation, even though he must have known that in *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861], argument of this kind had been proscribed. Defense counsel, however, failed to object.

The trial was also tainted by pervasive and serious deficiencies by defense counsel unrelated to prosecutorial misconduct.

Most generally, defense counsel egregiously failed to prepare his case for life. This fact is revealed by even the most cursory review of the testimony of Louis G. Nuernberger, M.D., a psychiatrist. Dr. Nuernberger could have been a strong witness. But, because of counsel's default, on cross-examination his credibility was undermined.

More specifically—to cite but a few instances—in the course of jury selection defense counsel inexplicably failed to peremptorily challenge a woman who was subsequently sworn as a juror, in spite of the fact that she had expressed views on the use of drugs that were unfavorable to defendant's position. Also, in cross-examining a prosecution witness, counsel unnecessarily suggested that defendant had used a handgun in the Foster

Freeze robbery, even though the victim testified that he "thought it was a starter pistol." Further, during direct examination of a defense witness, counsel, for no reason, elicited the fact that defendant had been in custody one month before the offenses in question. And, in summation, counsel argued, to no purpose and with no evidence, that defendant had almost killed his brother in a knife fight. Contrary to the majority's assertion, counsel did not simply "fail[ ] to challenge" argument to this effect by the prosecutor. (Maj. opn., *ante*, at p. 931, fn. 27.) If only he had.

Considered together, defense counsel's pervasive and serious deficiencies "resulted in a breakdown of the adversarial process at trial; that breakdown establishes a violation of defendant's federal and state constitutional right to the effective assistance of counsel; and that violation mandates reversal of the judgment even in the absence of a showing of specific prejudice." (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 84 [5 Cal.Rptr.2d 495, 825 P.2d 388] (dis. opn. of Mosk, J.).) " 'The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective' of punishment in accordance with deserts. [Citations.] In other words, 'The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness.' [Citation.] It follows that the system requires 'meaningful adversarial testing.' [Citation.] When [as here] such testing is absent, the process breaks down and hence its result must be deemed unreliable as a matter of law." (*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1236-1237 [259 Cal.Rptr. 669, 774 P.2d 698] (conc. & dis. opn. of Mosk, J.).)

For these reasons, I would reverse the judgment of death.

Appellant's petition for a rehearing was denied October 27, 1993, and the opinion was modified to read as printed above. Mosk, J., was of the opinion that the petition should be granted.